**In re Franklin Grant WALLACE, Debtor.**

**Robert J. BLACKWELL, Trustee, Plaintiff,**

v.

**Franklin Grant WALLACE and Wilma M. Wallace and Union Electric Company**

**and**

**The Boatmen's National Bank of St. Louis and Centerre Trust Company of St. Louis, Defendant.**

Bankruptcy No. 83–00478(1). Adv. No. 83–0429(1).

United States Bankruptcy Court, E.D. Missouri, E.D.

Aug. 29, 1986.

---

**1.** *But see* 11 U.S.C. § 362(h) which statutorily creates a remedy of contempt for a willful violation of § 362.

Robert J. Blackwell, St. Louis, Mo., trustee/plaintiff.

Mark G. Zellmer, St. Louis, Mo., for plaintiff/trustee.

Gerald K. Rabushka, Clayton, Mo., for debtor/defendant.

Joan M. Burger, St. Louis, Mo., for defendant Wilma Wallace.

Thomas W. Dietrich, St. Louis, Mo., for defendants, U.E. and Centerre Trust Co. of St. Louis.

John D. Evans, Jr., St. Louis, Mo., for defendant Boatmen's.

## MEMORANDUM OPINION

ROBERT E. BRAUER, Chief Judge.

By (four counts of) a five count Amended Complaint, the Plaintiff, Chapter 7 Trustee, seeks to avoid, as to Defendant Wilma Wallace (Wilma), (what is asserted to be) transfers to her of marital property, by the provisions of the decree dissolving her marriage to the Debtor, Defendant Franklin Grant Wallace (Wallace, or, Debtor), as transfers avoidable under the fraudulent transfer section of the Bankruptcy Code (11 U.S.C. 548), or under the preference provisions of the Code (11 U.S.C. 547). The subject matter of the avoidance Counts (Count I through IV) are the marital residence, 2847 Wismer, Overland, Mo., and 42.86% of Debtor's interest in his employer's [1] Retirement Plan. By Count V, the Plaintiff Trustee seeks the entry of a turn over order requiring the Debtor, Union Electric Co., his employer, and two trustee Defendants, to turn over to him (Plaintiff), as property of the estate, Debtor's interest in the Union Electric Retirement Plan [2], and Debtor's interest in the Union Electric Company Tax Reduction Act Stock Ownership Plan. [3]

Debtor and Wilma were married on May 17, 1946. The decree dissolving their marriage was entered February 14, 1983. Their last separation occurred January 29, 1981. Wilma's petition to dissolve the marriage was filed soon thereafter, on March 11, 1981.

The dissolution decree finds and states that the Debtor was guilty of certain marital misconduct. Marital property was apportioned by the decretal court, to Wilma, and to the Debtor. An award of specifically denominated maintenance was made, also, to Wilma. The pertinent decretal provisions will be referred to, and discussed, later, as the need so to do becomes (or, may seem to become) apparent.

.    .    .    .    .

As preliminary matters, this Court has before it Wilma's Motion To Dismiss and her demand for a jury trial. In her Motion To Dismiss, it is asserted that the Bankruptcy Court lacks jurisdiction, that the doctrines of collateral estoppel and res judicata apply, and that any affirmative action on the Amended Complaint would be against public policy.

Contrary to her contention, this Court does have jurisdiction of the Cause under 28 U.S.C. 157(b)(2)(E) and (H).

Moreover, the principles of res judicata and collateral estoppel are not applicable, here, since creditors of the Debtor, and of Wilma, were not parties to the dissolution proceeding, in which interests in marital property were affected. *Glasscock v. Citizens Nat'l. Bank*, 553 S.W.2d 411, 413 (T.Civ.App., 1977).

Also, the argument that any action taken by this Court would be contrary to public policy is to be rejected. Indeed the dictate of public policy, as manifested by

1. Defendant Union Electric Co.

2. Having an agreed-to actuarial value of $71,-774.06 as of January 3, 1983. Bankruptcy, under Chapter 7 of the Bankruptcy Code, ensued on March 22, 1983.

3. As agreed to, 291.378 shares of Union Electric common stock, having a value of $4,224.98 as of

the moment immediately prior to the entry of the dissolution decree. Debtor's interest under this Plan was augmented by an additional 25.97 shares of Union Electric stock, between March 31, 1983, and September 30, 1983, through reinvestment of dividends.

provisions of the Bankruptcy Code, requires judicial examination where there are transfers of interests in property made just prior to the filing of a petition for relief in bankruptcy whether those transfers are voluntary or involuntary. Accordingly, Wilma's Motion To Dismiss is being overruled.

█ Wilma also timely filed a Demand For Jury Trial. This demand was denied, but was reasserted by her counsel prior to the trial, and again overruled. Whether we rely on the rule of law as expressed prior to or since the enactment of the Bankruptcy Amendments of 1984, it has been widely held that jury trials are not applicable to or required in, as here, fraudulent conveyance or voidable preference actions. *In Re Minton Group, Inc.,* 43 B.R. 705, 12 B.C.D. 479 (Bankr.S.C.N.Y.1984); *In Re Otis,* 13 B.R. 279 (Bankr.N.D.Ga.1981); *In Re Rodgers & Sons, Inc.,* 48 B.R. 683, 12 B.C.D. 1255 (Bankr.E.D.Ok.1985).[4]

█ Avoidance of the decretal-ordered transfers is sought by the Trustee under two theories, as stated. And, money damages are sought as an alternative to retransfer (after avoidance). This request, for money, in the alternative, in only incidental to the primary equitable relief requested, avoidance of the transfers.

Accordingly, Wilma's demand for jury trial is overruled.

. . . . .

As stated earlier, the dissolution decree of February 14, 1983, apportioned marital property[5] to the Debtor, and to Wilma.

Under the decree, Debtor was to receive, by the Court's apportionment:

| Property | Value |
| --- | --- |
| 291.378 shares of Union Electric Co. Common Stock | $4,224.98 |
| 57.14% of Union Electric Retirement Plan | |
| Cash | 25.00 |
| Checking Account | 50.00 |
| A refrigerator, two air conditioners, a television, clothing and personal effects | 400.00 |
| 1978 Dodge Aspen | 2,900.00 |
| Credit Union Account | 30.00 |

and Wilma was to receive

| Property | Value |
| --- | --- |
| Real estate located at 2847 Wismer, Overland, Mo. | $27,000.00 equity |
| 1978 Buick | 3,000.00 |
| 42.86% of Union Electric Retirement Plan | |
| Two televisions, three clothing washers, dishwasher, refrigerator, dryer, miscellaneous clothing and furniture | 825.00 plus |

In addition the court awarded Wilma $500.00 a month maintenance.

---

**4.** Insofar as the *Rodgers* case holds that a Bankruptcy Judge may convene a jury trial, I do not agree with it.

**5.** "Marital property" for purposes of disposition of property within the context of dissolution only is defined in § 452.330(2) R.S.Mo. (Supp. 1984) as:

2. For purposes of sections 452.300 to 452.-415 only, "marital property" means all property acquired by either spouse subsequent to the marriage except:

(1) Property acquired by gift, bequest, devise, or descent;

(2) Property acquired in exchange for property acquired prior to the marriage or in exchange for property acquired by gift, bequest, devise or descent;

(3) Property acquired by a spouse after a decree of legal separation;

(4) Property excluded by valid agreement of the parties; and

(5) The increase in value of property acquired prior to the marriage.

3. All property acquired by either spouse subsequent to the marriage and prior to a decree of legal separation is presumed to be marital property regardless of whether title is held individually or by the spouses in some form of coownership such as joint tenancy, tenancy in common, tenancy by the entirety, and community property. Each spouse has a common ownership in marital property which vests not later than the time of commencement by one spouse against the other of an action in which a final decree is entered for dissolution of the marriage or legal separation, the extent of the vested interest to be determined and finalized by the court pursuant to this Chapter. The presumption of marital property is overcome by a showing that the property was acquired by a method listed in subsection 2.

4. The court's order as it affects distribution of marital property shall be a final order not subject to modification.

5. A certified copy of any decree of court affecting title to real estate shall forthwith be filed for record in the office of the recorder of deeds of the county and state in which the real estate is situate by the clerk of the court in which the decree was made, and the filing fees shall be taxed as costs in the cause.

In its findings, the Circuit Court determined certain facts that established the basis for this unequal distribution and award of maintenance. Wilma Wallace was found to be sixty-two (62) years of age, of limited education and training, and was receiving $337.00 per month in Social Security Disability. During the years of marriage to Franklin, Wilma had contributed at least equally to her husband to the acquisition of marital property. The court considered the financial contributions she made in the earlier years of the marriage when she was employed, as well as her role as homemaker. The court concluded Wilma was not able to support herself through appropriate employment. The court also found that even after the distribution of the marital property, she could not provide for her reasonable needs and that the award of maintenance was appropriate.

Franklin Wallace was sixty-one (61) years of age at the time of dissolution, and an employee of Union Electric Company for at least forty-one (41) years. His pension rights were then fully vested and he was then eligible for early retirement. The monthly disposable income of Franklin for 1982 was determined to be $1,637.69.

The dissolution court found also, that the marital misconduct of Franklin Wallace was of such a magnitude so as to justify an unequal division of marital property in favor of Wilma Wallace. This consideration of the conduct of the parties during the marriage, in the division of marital property, is expressly recognized in § 452.-330(1)(4) R.S.Mo. (Supp.1984).

The real estate located at 2847 Wismer in St. Louis County, Missouri, was considered by the court to be the most significant item of marital property. It was purchased by the Wallaces in 1966 for $19,500.00. They held the property as tenants by the entireties. The value of the property at the time of the divorce was $39,000.00, with mortgage indebtedness secured by deed of trust with a balance of $12,000.00. The monthly mortgage payment was $155.00.

The Circuit Court of St. Louis County awarded the real property to Wilma Wallace and ordered the parties to "sign any and all documents and do any and all things necessary to carry out and give effect to this decree". The Court further provided in its order that Wilma be awarded one-half of that portion of Franklin Wallace's retirement benefits under the Union Electric Company Retirement Plan for employees, if and when received, in the proportion determined by dividing the number of whole years of the marriage by the number of whole years Franklin Wallace was employed by Union Electric Company. The parties have stipulated that the percentage award to Wilma under this equation would be 42.86%.

The two dispositions of property, of the marital home and of the pension plan, are now the subjects of the Trustee's Complaint. He charges that these were transfers for which the Debtor received less than reasonably equivalent value, that Debtor was insolvent on the date of the transfers, or became insolvent as a result of these transfers. As such, he claims they are subject to avoidance under 11 U.S.C. 548. Additionally, the Trustee seeks the turnover of money and securities from the fiduciaries of the pension plan and the stock ownership.

The pertinent portions of 11 U.S.C. 548 establishing the elements of a fraudulent conveyance applicable to this case are as follows:

"(a) The Trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor—

. . . . .

(2)(A) received less than a reasonably equivalent value or exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred or became insolvent as a result of such transfer or obligation.

. . . . .

(d)(1) For the purposes of this section, a transfer is made when such transfer becomes so far perfected that a bona fide purchaser from the debtor against whom such transfer could have been perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee, ...

(2) In this section—

(A) 'value' means, property, or satisfaction or securing of ·a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor; ..."

The Trustee also seeks to avoid the transfers under 11 U.S.C. 547, which reads in pertinent part:

"(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition;

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of the title."

### RETIREMENT PLAN

■ Debtor, at bankruptcy (March 22, 1983) was 61 years old, and actively employed by Union Electric Company. He had been employed there for 41 years, having earned gross wage income, in 1980, of $22,460.16; in 1981, $24,703.88; and in 1982, $26,423.12. In 1982, after taxes, Debtor's net wage income was $19,652.23.

As such employee, Debtor is the beneficiary of the Union Electric Retirement Plan. He has *not* contributed to that Plan, however, the funding of his beneficial interest coming from his employer's contributions exclusively.[6]

The Plan contains provisions against the assignment or alienation of any retirement income, benefit or refunds under the Plan, whether by voluntary action or operation of law.

Wilma was awarded 42.86% of Debtor's interest in the Retirement Plan by the decretal court in its dissolution decree, as part of the award to her of marital property.

By Count V of the Amended Complaint, the Plaintiff Trustee seeks to compel a turn-over to him of Debtor's interest in the Plan. (By Counts III and IV of said Amended Complaint, said Trustee Plaintiff seeks to avoid the transfer, by the decree, to Wilma, of 42.86% of Debtor's interest in the Retirement Plan, either because the transfer constitutes a fraudulent conveyance, or because it constitutes a preference.)

He contends that Debtor's (beneficial) interest in the Plan constitutes property of the estate under 11 U.S.C. 541, upon the authority of *Regan v. Ross*, 691 F.2d 81 (2 Cir., 1982), and *In Re Werner*, 31 B.R. 418, 10 B.C.D. 1117 (Bankr.Ct., D.Minn., 1983). The authority is misplaced, as the plan in *Werner* is an employee-contributory plan, whereas, here, the Debtor has *not* contributed to the Retirement Plan;[7] and *Regan*

---

**6.** The Plan has been solely employer-funded since July 1, 1948. Article IX of the Plan provides for retroactive contributions by employees for those pre-July 1, 1948, periods when employee contributions were made. Debtor did not make any such contributions, retroactively or otherwise.

**7.** *In Re Graham,* infra, is distinguishable for the same reason. Also, here Debtor's interest in the Retirement Plan is "vested", in that, at bankruptcy, he could have voluntarily retired and received reduced retirement benefits. The Trustee argues that this "power" precludes the existence of a spendthrift trust. To the extent that

*v. Ross* is not in point, as the gist of its holding is that a Chapter 13 Debtor's beneficial interest in a noncontributory trust may be utilized *by him* to fund a Chapter 13 Plan because a blind application of the 541(c)(2) exclusion, to prohibit such use, is contrary and inconsistent with the rehabilitative spirit and purpose of Chapter 13.

541(c)(2) specifically excludes from property of the estate traditional spendthrift trusts. 4 *Collier on Bankruptcy*, 15th Ed., Sec. 541.23, pp 541–103 et seq; *In Re Ridenour*, 45 B.R. 72 (Bankr.Ct., E.D. Tenn., 1984), citing and construing *In Re Graham*, 726 F.2d 268 (8 Cir., 1984).

The Union Electric Retirement Plan, funded exclusively by the Electric Company in respect of the Debtor's beneficial interest, is a traditional spendthrift trust, recognized as such under Missouri law, and is excluded, by 541(c)(2), as property of the estate, *Graham*, supra, loc cit 1271.

Trustee's claim for the turnover of Debtor's decretal share of his beneficial interest in the Retirement Plan, is accordingly to be denied.

.     .     .     .     .

Trustee's attempt to avoid the decretal award of 42.86% of Debtor's beneficial interest in the Retirement Plan to Wilma (by Counts III and IV of his Amended Complaint), must fail, as well. The transfers of property, which are subject to the Trustee's avoiding powers under 11 U.S.C. 547 (Count IV), and 548 (Count III), are transfers of property (or of interest therein), which, except for the transfer, would constitute property of the estate under § 541. See 4 *Collier on Bankruptcy*, 15th Ed., Sec. 547.08(2), pge 547–38.[8] Since Debtor's interest, at bankruptcy in the Retirement Plan would not constitute property of the estate [11 U.S.C. 541(c)(2), supra], the ap-

portionment of 42.86% of it to Wilma by the decretal court cannot be avoided.

.     .     .     .     .

### U.E. COMMON STOCK

Debtor is a "Participant" in the U.E. Tax Reduction Act Stock Ownership Plan, by which a trust was created, to which Union Electric could elect and has elected to make certain contributions, and Participant employees could elect to make certain contributions, all of which are to be invested primarily in the common stock of the Company.

At bankruptcy (March 22, 1983), there were 291.378 shares of U.E. Stock in Debtor's Participant's account. According to trial Exhibit 9, Debtor contributed only $490.00 (capital) to the trust plan ($266.00 in Plan Year 1979, purchasing 19.740 shares, and $224.00 in Plan Year 1978, purchasing 15.040 shares); these contribution-shares earned dividends of $140.42 (10.787 shares), and of $51.65 (3.740 shares). Each of these shares had a value of 14½ at bankruptcy. The remaining shares were purchased as a result of Debtor's employer's contributions to the Plan, and allocated to Debtor's Participant's account, as were all dividends upon all of the shares allocated to his account.

All 291.378 of the shares were apportioned to the Debtor, as his marital property, by the Dissolution Court. The Trustee seeks all of those shares, together with an additional 25.97 shares received between March 31, 1983, and September 30, 1983, through reinvestment, as non-exempt property of the estate.

Section 8.3 of the Plan contains the usual anti-alienation restrictions, which bespeaks a spendthrift trust, usually *not* property of the estate under Section 541(c)(2) of the Bankruptcy Code, 11 U.S.C. 541(c)(2). Spendthrift trusts, to escape becoming property of the estate under Section 541 of

*Werner* so says, 31 B.R. 418, 10 B.C.D. loc cit 1119, I do not believe it expresses good law and do not choose to follow it.

**8.** Section 548 does not specifically restrict the avoidance of fraudulent conveyances to property which would constitute property of the estate.

Nevertheless, the Section is aimed at the recovery of conveyances which were made in fraud of creditors who, but for the fraudulent disposition, would have been able to subject the property conveyed to their debts.

the Code, must truly be traditional spend-thrift trusts recognized as such by the law of the State where created. One of the indicia of a non-traditional (and non-recognizable) "spendthrift" trust is a trust created by a settlor for his own benefit.

The Plaintiff Trustee contends that the Debtor's voluntary contributions to the Plan destroy the traditional spendthrift trust character of the Trust and of his Participant's account within it, the distinction extending to the whole of the account and not just to the shares, and dividend shares, purchased with and attributable to Debtor's voluntary contributions.

■ Further, the Plan (Article VI) provides for the termination of a Participant's interest in it, and distribution to him of his account, upon termination of his employment, by death or otherwise. The Plaintiff Trustee argues that since the Debtor can terminate the trust, by quitting his employment, a power vested in him exclusively, the trust should not be recognized under 541(c)(2) as a traditional spendthrift trust. The Trustee relies upon *In Re Werner*, 31 B.R. 418, 10 B.C.D. 1117, 1119 (Bank., D.Minn., 1983) to sustain this contention. *Werner* is, in my view, a minority view, which I will not follow. The better view is that expressed by *In Re Sheridan*, 38 B.R. 52, 55 (Bank., D.Vt., 1983); *In Re Rogers*, 24 B.R. 181 (Bank., D.Ariz., 1982); *In Re Kwaak*, 42 B.R. 599 (Bank., D.Me., 1984), which hold that an employee's ability to terminate an employment trust, of which he is a beneficiary, by quitting his job, does *not* disqualify the trust as a spendthrift trust under 541(c)(2).

■ Further, the Plan (Section 6.2) provides that there shall not be any distribution of a Participant's Account to him while he still is an employee of Union Electric, *except* that U.E. *may*, in its sole discretion,

upon written request of the Participant, permit distribution from the Participant's Account of (a) all or any portion of the U.E. common stock, acquired by Employer contributions or Participant contributions at least eighty-four months prior to distribution,[9] and (b) any portion of the Participant's account acquired by dividends or other income.

The Trustee equates the right to request to a right to withdraw, and cites *In Re DiPiazza* as authority that such a "right", an unqualified right to withdraw, defeats the spendthrift nature of the trust. *DiPiazza* so holds, but in a case where the Debtor employee had the unqualified right to terminate the trust by withdrawal during his employment.

Such is *not* the case, here, where the only "right" the Debtor has is a "right" *to request*, which is not the same as the "right" *to receive*. In similar circumstances, Bankruptcy Courts have held that the employer's-settlor's control over action upon the request permits the trust to retain its spendthrift characteristics. *In Re Crenshaw*, 51 B.R. 554 (D.C., N.D.Ala., 1985); *In Re Guernsey*, 54 B.R. 68 (Bank., S.C.Fla., 1985). I so agree.

■ Debtor's voluntary contributions to the Plan Trust *does* defeat its spendthrift characteristics, however,—at least to the extent of the value, at bankruptcy, of the stock attributable to his contributions, and of the stock issued as dividends thereupon.[10] It is my judgment, and I so hold here, that those voluntary contributions do not, however, destroy the whole of Debtor's Participant's account in the Plan as spendthrift, so that the shares of the stock, in his account, attributable to U.E.'s contributions and to stock dividends upon the stock acquired from those contributions, do

---

**9.** The Plan became effective January 1, 1976. The first Plan Year is 1976. The extent of Debtor's Participant's account and the shares allocated to it may not have become apparent until 1977. If not, Debtor, at bankruptcy, could not have then (or prior thereto) successfully requested distribution of stock under this provision.

**10.** I have not found any case, and the Trustee has cited none, where the whole of the Trust account, including that portion attributable to the employer's contributions, loses its spendthrift characteristics simply because of the employee's voluntary contributions.

*not* become property of the estate in this case.

The value, at bankruptcy, of the shares purchased by Debtor's voluntary contributions to the Plan, and of the stock dividends attributable thereto, is $714.95 (49.307 shares, at 14.5). Subsequently, and by September 30, 1983, an additional 25.97 shares of U.E. Common Stock were allocated to Debtor's Participant's Account, through reinvestment of the 291.378 shares owned at bankruptcy. Assuming that Debtor was entitled, at bankruptcy, to the 25.97 shares (a fact not in evidence), 16.92% thereof would be attributable to Debtor's voluntary contributions (or 4.394 shares, at 14.5, or $63.71).

The Trustee is entitled to judgment upon Count V of his Amended Complaint, for the turn over to him of 53.701 shares of U.E. stock, unless the stock is claimable as part of the Debtor's exemptions.

■ Debtor made no such claim upon his Schedule of exemptions, Schedule B–4. On June 22, 1984, without leave of Court, he filed an amended Schedule B–4, claiming "any interest that Debtor has or may have in his retirement or pension plan and stock ownership plan with Union Electric Company which are exempt to the extent necessary to provide for his support and his dependents", claiming under 513.-430(10)(e)V.A.M.S. Earlier, on October 14, 1983, in his Answer to the Plaintiff's Amended Complaint, the Debtor claimed his interest in the stock ownership plan was exempt (para. 5, p. 3, of Answer).

The Trustee argues against the exemption because the claim came too late; and because the exemption statute exempts only payments being received, and not the corpus which may permit of exemptable payments in the future, citing, for the latter, *In Re Clark*, 18 B.R. 824, 829 (Bank., E.D.Tenn., 1982), construing a similar Tennessee provision.

I agree with *Clark*. 513.430(10)(e) exempts only payments being received. Debtor was not receiving any payments under the Stock Ownership Plan at bank-

ruptcy. Exemptions speak as of bankruptcy, not as of some later time.

Whether Debtor's amended exemptions claim was prejudicially tardy (as the Trustee claims), or not, the issue is of no moment, as Debtor's Amended Schedule B–4 reflects that he has utilized all of his other available exemptions under 513.430 and 513.440 in other property. Such other exemptions are, thus, not available; and 513.-430(10)(e) is not available, as stated.

.    .    .    .    .

## REAL ESTATE

This Court has previously determined that transfers made in respect of a dissolution cause may be avoided by a bankruptcy trustee. *In Re Lange*, 35 B.R. 579 (Bankr. E.D.Mo., 1983).

There are distinguishing features between *Lange* and the matter sub judice. In *Lange*, the parties entered into a separate agreement outside of the divorce decree, albeit as a part of the dissolution cause, in which they agreed that the wife would receive the marital real estate, and the debtor would execute the necessary documents to transfer his interest in that real estate. On the day following the dissolution hearing, the debtor quit-claimed his interest in the real estate to his ex-wife. The dissolution decree itself did not specifically award the wife the real estate.

■ In the case sub judice, there is no evidence that the Debtor and Wilma entered into any agreement with regard to the disposition of the marital property. The transfer of property was by virtue of the dissolution decree. Even so, the reasoning in *Lange* is still appropriate. Whether the transfer was a result of a separation agreement, property settlement, or divorce decree, the Trustee in bankruptcy may avoid such transfers.

The case law in this area is rather limited but as concluded in *Lange*, property so transferred is not unassailable by the bankruptcy trustee.

■ Inherent in similarly concluding in this case is the postulate that there is a transfer, within the meaning of the avoida-

bility statutes of the Bankruptcy Code, to avoid. "Transfer" subsumes a disposition of a transferable interest in property, of some kind.[11] Wilma argues, Missouri not being a community property state, Debtor's interest (prior to dissolution) being as tenant by the entirety, that Debtor's interest was not at the moment of the decree determinable, an interest not transferable. The argument is not tenable.

The stipulated evidence is that prior to the entry of the dissolution decree, the Debtor and Wilma owned the real estate as tenants by the entirety, a form of ownership recognized by Missouri common law, and still recognized. *Nelson v. Hotchkiss*, 601 S.W.2d 14, 17 (Mo.Sup., banc, 1980). As such tenants, each owned an undivided interest in the whole of the real estate.[12] It is this interest, or Debtor's undivided one-half interest as tenant in common [13], that was disposed of by the decree, an involuntary transfer within the meaning of the Section 101(40).[14]

Following the entry of the decree, an appropriate copy was filed in the Office of the Recorder of Deeds for St. Louis County, the county in which the real estate is situated, a requirement of Section 452.-330(5) V.A.M.S. [R.S.Mo. (Supp.1984)]. Thereafter, no bona fide purchaser from the Debtor could acquire an interest in the real estate superior to Wilma's interest, now an ownership interest of the entire estate in the real estate.

Unquestionably, the dissolution court possessed the power to dispose of the real estate (and of the interest of each party therein) as marital property. And in view of the evidence before it, it is not surprising that Wilma received a substantial portion of the marital property, and in that respect the court's disposition appears "just" and "fair". Nevertheless, the Bankruptcy Code requires the disposition to be measured by different standards. *In Re Lange*, supra, loc cit 584.

A transfer occurred. Did the Debtor receive a reasonably equivalent value in exchange? Wilma contends that he did.

The marital property and its value, awarded by the decretal court to Wilma, and to the Debtor, has previously been set forth. The portion awarded Wilma had a much greater monetary value. Nevertheless, she argues that the Debtor received a reasonably equivalent value (within the meaning of Section 548) for such award to her, in that there was a reduction or limitation of Debtor's obligation to her for her future support, and in the satisfaction of her cause of action against him for marital misconduct.

The value that a transferring Debtor must receive to permit the transfer to escape or survive the Trustee's power to avoid is the value defined by 11 U.S.C. 548(d)(2)(A), as that which "means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor". At least one Court has

---

**11.** Section 101(40), of the Bankruptcy Code, 11 U.S.C. 101(40) (applicable here, prior to the amendments of the Bankruptcy Amendments Act of 1984), provided: "transfer means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property ..."

**12.** Upon dissolution of a marriage, the interest of each spouse (absent any decretal award to the contrary) becomes an undivided one-half interest, as tenants in common.

**13.** If the decretal rupture of the marriage is thought of as having occurred prior to the announcement of the award or disposition of the

marital property. In that regard it may be noted that paragraph 1 of the Dissolution Decree provides for the dissolution of the marriage, and paragraph 2 of the Decree provides for the division of the marital property. Conceptually, too, the marriage had to be dissolved to enable the decretal court to excercise its power to divide the marital property. Once the dissolution occurred, Debtor's interest became as tenant in common, an interest transferable in Missouri and transferable under the Bankruptcy Code.

**14.** One might say, in the vernacular, that prior to the decree Debtor had somethin', but after the decree he had nothin'. The "somethin'" constitutes a transferable interest.

concluded[15] that there is a potential for regarding an express waiver of alimony by a spouse to be a *fair consideration* for the disposition of an excess (in excess of one-half) of community property to that spouse. *In Re Chappel,* 243 F.Supp. 417 (S.D.Cal., 1965).

Responding to this dictum, Wilma called, at the trial, as her witness, the decretal Judge, who testified that in determining the award of maintenance to her ($500.00 a month, not counting the grant to her as maintenance, a share of Debtor's retirement income, some $335.00/$350.00 a month at the time of trial, Debtor having retired prior to trial), he took into consideration the award to Wilma of the marital property, the $155.00 a month house payment she had to make in respect of it, and her inability to support herself. The rationale of his disposition is that which is required by 452.335 V.A.M.S.

The testimony was offered, to support an inference, contended for, that the maintenance award would have been increased were Wilma's housing expenses shown to be greater (than the $155.00 a month house payment); and, arguably, they would have been greater if Wilma were not allowed to keep the house;[16] and, the syllogism continues, her receiving what she did, less than what she would have (arguably), is a reasonable equivalent value within the meaning of Section 548.

The argument is based on speculation. Further, the possibility of an increased award, to be paid by the Debtor in the future, could not have presently benefited creditors of the Debtor.

4 *Collier on Bankruptcy,* 15th Ed., Sec. 548.09, at p. 548–109, points out that the value defined in Section 548(d)(2)(A) seems to leave no room for a mere executory promise from the transferee as constituting that value; the value received must be measured as that which is received at the time of the transfer, and, implicitly, that value received must be of benefit to the transferor's creditors[17]. "When the thing promised cannot benefit the creditors, an executory promise is certainly to be condemned." *Collier,* p. 548–110.

Wilma's failure to receive an increased maintenance award is, for value purposes, under Section 548, as though she promised not to seek an increased award if the real estate were awarded her, an executory promise scarcely of little benefit, if any at all, to Debtor's creditors then in existence.[18] In the circumstances of this case, it is my judgment that her not being awarded any greater amount of maintenance[19] does *not* constitute reasonably equivalent value within the meaning of Section 548(a)(2)(A).

Wilma also contends that she exchanged, gave up, waived, her cause of action against the Debtor, for marital misconduct, in exchange for the property transfers; and that this constitutes the required "value". I believe the contention was made with tongue in cheek; as, the "transfers" we are addressing were not voluntary transfers made by the Debtor in exchange for anything Wilma voluntarily surrendered. Further, Missouri law does not seem to recognize such a cause of action, so that a "surrender" of it (of something

---

**15.** Under Section 67(e) of the Bankruptcy *Act,* 11 U.S.C. 107(e) (now repealed).

**16.** She testified that a reasonable cost of housing, for her, in her neighborhood, were she to have to move, would be $350.00 a month.

**17.** Which underlies the authorities, under the Uniform Fraudulent Conveyance Act [the forerunner of Section 67(e) of the Bankruptcy *Act* (supra, note 15) and of Section 548 of the present Bankruptcy Code], that promises to support the debtor-transferor or even to discharge his obligations, were not fair equivalents. *Collier,* Sec. 548.09, p. 548–109.

**18.** It should be noted that the award of maintenance may be increased, upon proper application therefor, and proof of a change of circumstances.

**19.** She was awarded maintenance of $500.00 a month (*not* taking into account her receipt of 42.86% of Debtor's interest in the U.E. Retirement Plan, and interest [the totality of the interest] producing about $800.00 a month at the time of trial).

non-existent) is not consideration, of no value, whatsoever.

Marital misconduct, for sure, is a factor properly to be taken into account in a decretal division of marital property, as was done, here,—but, that misconduct does not supplant the required value, once bankruptcy ensues, to save the transfer decreed.

. . . . .

Finally, the factor yet to be determined is of the Debtor's insolvency at the time of the transfer. By stipulation the parties agreed that Debtor's liabilities, at the time of the decree, were $41,130.00, of which $16,760.00 (only) were joint debts with Wilma; and that his liabilities to bankruptcy remained the same, as they then had to be when the decree was recorded in St. Louis County land records.

A review of the evidence, and of counsel's arguments, is that Debtor's insolvency, at all critical times, is not seriously in dispute; and I find that he became insolvent as a result of the decree, which divested him of ownership interests in the real estate.

. . . . .

All of the Section 548 elements are proved. The Trustee's claim for avoidance under Section 547 (preferential transfer) need not be considered.

. . . . .

Finally, it should be pointed out that the Debtor, at the time of the assailed transfers, owed at least twenty-one (21) debts, totaling $22,470.00 (Parties Stipulation, para. 6) in respect of which Wilma was not (is not) indebted or liable. The satisfaction of these debts would be prejudiced by the transfer of Debtor's interest in the real estate for something less than a reasonably equivalent value.

. . . . .

Each Count of the First Amended Complaint constitutes a "Core proceeding", within the meaning of 28 U.S.C. 157(b)(2)(E), (F) and (H) [as amended by the Bankruptcy Amendments Act of 1984], of which this Court has dispositive jurisdiction.

A judgment upon the First Amended Complaint, in accordance with the findings and conclusions made and expressed herein, is being entered this date.