**In re Michael Boyd MEAD, Debtor.**

**Paul E. BERMAN, Trustee, Plaintiff,**

**v.**

**Michael Boyd MEAD and Centerre Bank, Defendants.**

**Bankruptcy No. 88–01353–3.
Adv. No. 88–0710–3.**

United States Bankruptcy Court, W.D. Missouri.

Feb. 9, 1990.

Max Jevinsky, Berman, DeLeve, Kuchan & Chapman, Kansas City, Mo., for plaintiff.

Joseph M. Chiarelli, Hoskins, King, McGannon & Hahn, Kansas City, Mo., for Michael Boyd Mead.

Thomas C. Graves, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., for Centerre Bank.

## MEMORANDUM AND ORDER

ARTHUR B. FEDERMAN,
Bankruptcy Judge.

Plaintiff Bankruptcy Trustee seeks to compel the Trustee of a Profit Sharing Plan & Trust* to pay to the bankruptcy estate that portion of the Plan's assets attributable to Debtor, Michael Mead. The Plan in question was first established on June 30, 1965 by the predecessor to Mead and Sons, Inc., a Missouri Corporation, and has been amended from time to time since to comply with changes in applicable law. Mr. Mead is now the President, as well as one of the directors and stockholders of Mead and Sons, Inc., which serves as Administrator of the Plan. The sole issue to be decided is whether the spendthrift trust provisions in such Plan are enforceable. The Court finds that they are not, and that Mr. Mead's vested portion should therefore be paid to the bankruptcy estate. Such decision is based on the right of beneficiaries such as the debtor to be paid their vested portion of Plan assets in a lump sum upon termination of employment or retirement.

The parties stipulated that Mr. Mead has been employed by the company since March 1, 1966, and has served as an officer and director of the company during that period. Prior to 1976 his father, Boyd Mead was President of the Company. At the time his Chapter 7 case was filed the debtor, his wife, Jeanette Mead, and his brother, Lawrence Mead, were the sole directors of the company. As of June 30, 1988, the total value of all funds in the Plan was $738,700.21, of which the debtor's share had a value of $179,647.79. The debtor's rights under the Plan are fully vested and non-forfeitable.

The Plan itself was established pursuant to 26 U.S.C. Section 401(a). All contributions are made by the employer out of company profits, as determined by its Board of Directors. While participation in the Plan is "voluntary", employees who choose not to participate receive no alternative compensation or benefits. The Company has the right to terminate the Plan upon 30 days notice, and to thereafter direct that each employee be paid his or her vested

* Subsequent to trial, Boatmen's First National Bank of Kansas City succeeded by merger to all rights and responsibilities of Centerre Bank related to this action.

share of Plan assets. (Exhibit B, Section 9.1 and 9.3, p. 78; Tr. 17–18).

Each participant in the Plan has an account on the books of the Plan Trustee in his or her own name, to which such Trustee each year credits that participant's share of the Plan's income as well as additional contributions made by the company. (Exhibit B, Section 3.4) In the event an employee leaves the company prior to the full vesting of his or her benefits under the Plan, the unvested portion of such participant's account is allocated among, and transferred to, the accounts of the remaining participants. (Exhibit B, Section 3.4(3)) The vested portion, however, is paid to the terminated employee in a lump sum. (Exhibit B, Section 5.5(b) p. 36; Exhibit C, Section 5.6, pp. 5–6) Upon retirement, as well, the company has elected to have the vested portion paid to the Participant in a lump sum, but the Participant can instead choose to have such funds used to purchase an annuity payable over his life and, if applicable, the life of his spouse. (Exhibit B, Section 5.6, p. 40; Exhibit C, Section 5.6, pp. 5–6) In at least one case, that of Boyd Mead, such retirement benefits were paid out in a lump sum. (Tr. 114)

As required by the Internal Revenue Code, 26 U.S.C. § 401(a)(13)(A) and the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1056(d)(1), the Plan (Exhibit B, Section 11.4, p. 86) contains an anti-alienation clause:

"(a) Except as required by law, no benefit payable under the Plan to a Participant or his Beneficiary shall be subject to anticipation, assignment, alienation, sale, transfer, pledge, encumbrance or charge, and any attempt to anticipate, assign, alienate, sell, transfer, pledge, encumber or charge shall be void. Neither shall such benefit be subject to attachment, garnishment, levy, execution or other legal or equitable process.

(b) However, the creation, assignment, or recognition of a right to any benefit payable with respect to a Participant pursuant to a 'qualified domestic relations order', as defined in Sections 401(a)(13) and 414(p), shall not be treated as a prohibited assignment or alienation...."

This Chapter 7 case was commenced on March 28, 1988, and was apparently prompted by the Debtor's investment as a General Partner in a failed real estate development. At the time of the filing, the Debtor showed monthly income of $7000 as his salary from Mead and Sons, Inc. Up until three days prior to the filing of the case, the Debtor had owned 567 shares of the stock of the company, and Lawrence Mead had owned 562 shares. However, on March 25, 1988 the Debtor sold six shares of his stock to his wife Jeanette for $3000, which funds she obtained through a loan from the Company. (Tr. 86) As a result, the Debtor contends he did not own a controlling interest in the company as of the date of filing. However, he did as of such date serve as President and Director of the company, as well as the sole member of the Retirement Committee established pursuant to the terms of the Plan.

This action was commenced by the Bankruptcy Trustee on November 2, 1988. Trial was conducted by the Honorable Dennis J. Stewart on May 5, 1989. Subsequent to Judge Stewart's death, the parties agreed that the matter could be decided on the existing record without the necessity of a retrial. Oral argument was held on January 29, 1990.

Section 541 of the Bankruptcy Code brings into the estate all property in which the debtor has a legal or equitable interest as of the date of the filing of the Petition. (11 U.S.C. § 541) The Debtor is then permitted to exempt that property of the estate which is necessary for a fresh start. *In re Graham*, 726 F.2d 1268 (8th Cir.1984) In Missouri such exemptions are determined by state law. (11 U.S.C. § 522(b); R.S.Mo. 513.427) An exception to this general scheme exists, however, with respect to "spendthrift trusts." Section 541(c)(2) of the Code provides that "[a] restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable non-bankruptcy law is enforceable in a case under this title." (11 U.S.C. § 541(c)(2)) In other words, if the spend-

thrift provisions of a trust are valid under "applicable non-bankruptcy law" the benefits to be paid to the beneficiary of such trust do not become part of his or her bankruptcy estate in the first place. The key in applying Section 541(c)(2) is an understanding of exactly what is meant by "applicable non-bankruptcy law." Under ERISA, 29 U.S.C. § 1056(d)(1), any and all plans such as the one involved here are required to contain spendthrift language such as that contained in the Mead and Sons, Inc. Plan. Since such restriction is not only enforceable under, but is in fact mandated by "non-bankruptcy law," namely ERISA, a small number of early cases found ERISA plans to be outside of the estate pursuant to Section 541(c)(2). *See In re Threewitt*, 24 B.R. 927, 929 (D.Kan. 1982); *In re Pruitt*, 30 B.R. 330, 331 (Bankr.D.Colo.1983).

The law in our own Eighth Circuit, however, is that whether an ERISA trust falls within the Section 541(c)(2) exception is a matter of whether the trust's spendthrift provisions are enforceable under state law. *Education Assistance Corp. v. Zellner*, 827 F.2d 1222, 1224–25 (8th Cir.1987). For example, *In re Swanson*, 873 F.2d 1121 (8th Cir.1989) involved a dispute over whether the interests of Minnesota teachers in a state (non-ERISA) pension fund were excludable from the bankruptcy estate under Section 541(c)(2). The Debtor's pension fund was governed by a Minnesota statute which required anti-alienation provisions similar to those of ERISA. After noting that Section 541(c)(2) was designed to preserve the status of traditional spendthrift trusts, the Court observed that "[t]he question remains, however, whether the fund qualifies as a spendthrift trust under Minnesota law." *Swanson*, 873 F.2d at 1123. The Court then went on to find that it did not.

■ In sum, a two-step analysis of ERISA Plans is required. The first step is to determine if the Debtor's share of Plan assets is excludable from the estate as a spendthrift trust under state law. If not excludable, such assets come into the estate and can then be claimed as exempt to the extent permitted. The second step is then to apply the governing exemption statutes. In Missouri, payments under certain pension, profit-sharing or similar plans may be exempted "to the extent reasonably necessary for the support" of the debtor and his or her dependents. R.S.Mo. 513.-430(10)(e). In this case, Mr. Mead has not claimed his share of Plan assets as exempt. As a result, the only issue here is whether the spendthrift provisions are enforceable under Missouri law.

Unfortunately, Missouri law gives little guidance on this question. The only state statute cited by the parties is R.S.Mo. 456.-080. As effective at the time this Chapter 7 case was filed, such statute provided as follows:

"A provision restraining the voluntary or involuntary transfer of beneficial interests in a trust will prevent the settlor's creditors from satisfying claims from the trust assets unless at the time the trust was established or amended:

"(1) The settlor was the sole beneficiary of either the income or principal of the trust or retained the power to revoke the trust; or

"(2) The settlor was one of a class of beneficiaries and retained a right to receive a specific portion of the income or principal of the trust that was determinable solely from the provisions of the trust instruments; or

"(3) The conveyance of assets to the trust was intended to hinder, delay or defraud creditors or purchasers pursuant to Section 428.020, R.S.Mo."

This statute deals only with whether creditors of a settlor can reach trust assets. But in this case the settlor of the trust is Mead and Sons, Inc., not Michael Mead. The parties agree that the corporate veil cannot be pierced; therefore, this statute is not applicable. See, *In re O'Brien*, 94 B.R. 583 (Bankr.W.D.Mo.1988).

In Missouri, as in other states, spendthrift provisions will not be upheld if to do so would contravene public policy. *Electrical Workers v. IBEW*, 583 S.W.2d 154 (Mo. 1979) Certain guidelines have developed to aid in predicting whether a spendthrift pro-

vision will be found to violate public policy. These guidelines are consistent with the traditional purpose and character of spendthrift trusts, which is to provide periodic payments, for the maintenance and support, of an individual to whom the settlor does not choose to entrust the entire gift all at once. Without the assurance that the trust corpus is protected for, and from, the beneficiary, the settlor might not choose to make such monies available to the beneficiary at all. As a result, the law in many states recognizes that so long as the beneficiary is absolutely barred from access to the corpus, his creditors are likewise barred. To do otherwise would be contrary to the intent of the settlor in creating the trust and donating assets to it.

Certain guidelines have developed to aid in predicting whether a spendthrift provision will be found to violate public policy. In general, courts will not enforce such spendthrift provisions if the settlor of the trust is also its beneficiary, or if the beneficiary of the trust has the power to revoke the trust and exercise dominion and control over the trust assets. *In re Swanson*, 873 F.2d at 1123, citing *McLean v. Central States, S.E. and S.W. Areas Pension Fund*, 762 F.2d 1204, 1207 (4th Cir.1985). "Self-settled" trusts are not enforced because enforcement would allow a debtor to shield his assets from creditors by simply transferring them to a trust of which he is the beneficiary. Thus, for example, if the corporate veil is pierced such that the debtor-beneficiary and the corporate settlor of the ERISA plan are treated as the same entity, the debtor's share of plan assets becomes part of the debtor's estate. *O'Brien, Id.;* See also *In re Graham*, 24 B.R. 305, 310 (Bankr.N.D.Iowa), aff'd, 726 F.2d 1268 (8th Cir.1984). If the debtor-beneficiary has the right to make contributions to the plan, he or she is treated as a settlor and the spendthrift provisions are not enforced. *Swanson, Id.; In re Wallace*, 66 B.R. 834, 842 (Bankr. E.D. Mo.1986). Similarly, if the plan is used to simply defer compensation due the beneficiary, he or she will be treated as a settlor. *Swanson*, 873 F.2d at 1124. In these cases, a settlor is not creating a trust to provide maintenance and support for someone else; instead, he is simply transferring his own assets from one pocket to another. Since the underlying rationale for spendthrift trusts is not served, the spendthrift provisions are not enforced.

However, the Mead and Sons Plan does not contain any of these defects. Participation in the Plan is, in effect, compulsory for all employees, since those who do not participate receive no alternative compensation or benefits. Contributions are made out of company profits only, and do not constitute a form of deferred compensation. Employees are prohibited from making additional contributions. The Plan was established prior to the Debtor's employment with the Company and does not constitute his alter ego. In sum, this is not a case in which the Plan could be found to be self-settled.

As stated, however, the spendthrift provisions will also not be enforced if the debtor-beneficiary has any ability to revoke the trust and exercise any dominion and control over trust assets. *Swanson*, 873 F.2d at 1123. For if the settlor chooses to give the beneficiary access to the corpus for his own discretionary purposes, then the very basis for spendthrift trusts—as a means of assuring the settlor that his beneficiary will receive periodic income, and not be able to squander the corpus—falls away.

There are two arguable reasons to hold that the debtor in this case has the ability to revoke the trust. Plaintiff contends that Michael Mead dominates and controls Mead and Sons and, through such company, the Plan. It is argued that his transfer of 6 shares of stock to his wife, three days prior to filing bankruptcy, was done in order to appear to divest himself of such control, but that in reality the debtor still runs the company. As President and a Director, it is contended he has the ability to cause Mead and Sons to terminate the Plan and direct the Plan Trustee to distribute all assets out to the participants, including himself. (Exhibit B, Section 9.1, Tr. 18–19) Plaintiff points out that from 1975 to 1983 the Company had a separate pension plan,

not involved in this case, that such plan was terminated by vote of the Board of Directors, including Michael Mead, and that as a result the debtor received a distribution of $39,500. Therefore, Plaintiff argues, the debtor could just as well cause a termination of the profit-sharing plan at issue here, and so he should be treated as having the power to revoke the trust.

Defendants point out that the pension plan was terminated because the Company lacked funds to make contributions which were required under that Plan's instrument, (Tr. 105) and that any decision to terminate the existing Plan would be made by the debtor in his representative capacity and subject to his fiduciary responsibilities to other participants in the Plan. As indicated, Plaintiff concedes that neither the Company nor the trust are alter egos of Michael Mead. In fact, the Company and Plan have always been separate and distinct from each other and the debtor. All decisions of the Company and the Plan appear to have been made with strict respect for corporate formalities. Despite the inartful stock transfer, Mr. Mead still appears to have substantial control; such transfer appears to have been intended to depress the value of the debtor's remaining stock in the hands of the bankruptcy trustee, and not to change day-to-day control over company operations.** Nevertheless, while Mr. Mead, because of his positions with the company and Plan, may be in a position to terminate the Plan and obtain his share of its assets, he is required at all times to act as a fiduciary for the benefit of all participants. Severe tax or other consequences could no doubt result to Plan participants from such a termination. While the debtor may technically have the power to cause a revocation of the trust, acting in his representative capacity, this Court will not on that basis attribute to him the power to revoke the trust in his individual capacity.

There is, however, another basis for holding that the debtor has the impermissible ability to revoke the trust. As indicated, all Plan participants have the right to a lump sum distribution of their benefits at the time their employment is terminated, or upon retirement. As previously shown, traditional spendthrift trusts parcel out money to their beneficiaries on a periodic basis while at the same time protecting the corpus from the discretion of such beneficiaries. The Plan in this case does not compel creation of such a steady source of income. In fact, the beneficiary is required to be paid his vested portion in a lump sum upon termination, and will also be paid such lump sum upon retirement unless he or she elects to the contrary. Courts have in the past been split on the enforceability of spendthrift provisions where the employee has the unfettered right to Plan assets upon termination of his employment. In *In re Faulkner*, 79 B.R. 362 (Bankr.E.D.Tenn. 1987) the debtor had the right, upon termination, to receive his vested portion of Plan assets in a lump sum if he so chose. The Court found that the debtor's vested interest was not beyond his control, and should therefore be brought into the estate. Accord, *In re Werner* 31 B.R. 418 (Bankr.D. Minn.1983). In our jurisdiction the District Court opinion in *In re Boon*, 108 B.R. 697, 708 (W.D.Mo.1989), found that "an employee's ability to terminate an employment trust, of which he is a beneficiary, by quitting his job, does not disqualify the trust as a spendthrift trust under 541(c)(2)," citing *In re Wallace*, 66 B.R. 834, 841 (Bankr.E. D.Mo.1986); and *In re Forbes*, 65 B.R. 58, 59 (Bankr.S.D.Fla.1986).

However, the most recent decision of our own Eighth Circuit Court of Appeals appears to be controlling. In *Swanson, Id.*, the Court held that a Plan which gave employees unlimited access to their vested funds upon termination did not pass muster under Section 541(c)(2). In so doing, the Court first found that the Plan was self-settled because employees had the right to make their own contributions. However, the Court went on to find that the spendthrift provisions failed because the benefi-

** It should be noted that such stock transfer has been the subject of other proceedings related to the *Mead* case.

**440**

ciaries had the right to their vested portion of Plan assets upon termination. The Court said:

"In addition, our conclusion that the Fund does not qualify as a spendthrift trust under Minnesota law is compelled by the fact that the debtors are able to exercise dominion and control over the monies in the Fund. TRA members are entitled to a refund of their contributions to the Fund upon termination of employment. While this is a very limited right of control over the Funds, the ability of the beneficiary to control trust assets in any way is inimical to the policies underlying the spendthrift trust." 873 F.2d at 1124.

■ In this case, the beneficiary likewise has the ability to immediately obtain his vested portion upon retirement or termination. Such an ability is "inimical to the policies underlying the spendthrift trust," and is not consistent with the purposes traditionally served by spendthrift trusts. Therefore, the money he is entitled to obtain upon such termination should be brought into the estate, subject to any applicable exemptions. Since Mr. Mead does not claim that any such funds are exempt as reasonably necessary for his or a dependent's continued support, such funds must remain with the Bankruptcy Trustee for distribution to his creditors. "The policy of enlarging the bankruptcy estate to the maximum extent allowable under the Code is of paramount importance because only then will creditors receive the distribution that they are entitled to under the Code." *Swanson*, 873 F.2d at 1124.

■ One final point concerns the tax ramifications of a court-ordered turnover of a participant's vested benefits. Defendants contend that the Internal Revenue Service might take the position that payment of the value of a participant's benefit into the participant's bankruptcy estate violates the statutorily mandated prohibition against assignment or alienation, and would result in disqualification of the Plan. As indicated, both the Revenue Code and ERISA require anti-alienation provisions. 26 U.S.C. § 401(a)(13)(A) provides that "A

Trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated ..." A plan which contains the requisite language should not be disqualified because it complies with an Order. to turn over those assets attributable to a participant who files bankruptcy. The funds ordered to be turned over are the same as the Plan would pay out in a lump sum upon the termination or retirement of Mr. Mead. Compliance with this Order should therefore not create adverse tax consequences for the Plan or its other participants.

For these reasons, judgment is entered in favor of the Plaintiff, and against Defendants as follows:

(1) Defendants shall, within 15 days, account to Plaintiff for all contributions made to, all earnings, additions or increases to, and all withdrawals from the Mead and Sons, Inc. Employees' Profit Sharing Plan and Trust by or on behalf of Michael B. Mead; and

(2) Defendants shall, within 15 days, pay over to Plaintiff all of Michael B. Mead's interest in the Mead and Son's, Inc. Employees' Profit Sharing Plan and Trust, in the amount of $179,647.79, more or less.

This Memorandum constitutes findings of fact and conclusions of law under Fed.R. Bankr.P. 7052.