**In re Timothy Lee IDALSKI and Stephanie Ann Idalski, Debtors.**

**Bankruptcy No. 90–11021.**

United States Bankruptcy Court,
E.D. Michigan,
Southern Division, Flint.

Jan. 23, 1991.

---

Michael W. Krellwitz, Flint, Mich., for debtors.

Michael A. Mason, Flint, Mich., Trustee.

## MEMORANDUM OPINION ON TRUSTEE'S MOTION FOR TURNOVER

ARTHUR J. SPECTOR, Bankruptcy Judge.

On June 20, 1990, the trustee filed a Motion for Turnover of Non–Exempt Savings and for Extension of Time to File Complaint Objecting to Discharge. In this motion, the trustee seeks an order requiring Timothy and Stephanie Idalski ("Debtors") to turn over $5,166.23 to the estate. According to the trustee, this sum represents the total voluntary pre-petition payments, with interest, paid by Stephanie Idalski to the Genesee County Employees Retirement System, which were subsequently repaid to her when she terminated her employment post-petition. In their answer, the Debtors conceded the relevant factual allegations made by the trustee, but denied that the trustee was entitled to the funds.

The issue before the Court is whether Mrs. Idalski's interest in the retirement plan is excluded from the estate by operation of § 541(c)(2). This section states: "A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title." 11 U.S.C. § 541(c)(2).

At the time the Debtors filed their bankruptcy petition, Mrs. Idalski's interest in the plan was subject to a restriction on transfer; consistent with the requirements of ERISA[1] and the Internal Revenue

---

1. The Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* Under

Code,[2] the plan contains a clause which prevents the voluntary or involuntary alienation of plan benefits. Under Michigan law, this anti-alienation clause, sometimes referred to as a "spendthrift" clause, may operate to exclude all or some portion of Mrs. Idalski's interest in the plan. Pursuant to Mich.Comp.Laws § 600.6023(1)(*l*), creditors are precluded from levying on

> [t]he right or interest of a person in a pension, profit-sharing, stock bonus, or other plan that is qualified under section 401 of the internal revenue code, or an annuity contract under section 403(b) of the internal revenue code, which plan or annuity is subject to [ERISA]. This exemption applies to the operation of the federal bankruptcy code, as permitted by section 522(b)(2) of title 11 of the United States code, 11 U.S.C. 522. This exemption does not apply to any amount contributed to [such] a plan or ... annuity if the contribution occurs within 120 days before the debtor files for bankruptcy.

Mich.Comp.Laws § 600.6023(1)(*l*).

The parties have not indicated whether some or all of Mrs. Idalski's contributions to the plan were made within the 120–day period specified in the statute. Even if all of the contributions were made within this time frame, however, it could be argued that Michigan law is preempted by ERISA insofar as it purports to limit the extent to which ERISA-qualified plans are exempt from levy.[3] On the other hand, an argument could be made that the foregoing statute does not apply to this plan, which was entirely funded by Mrs. Idalski's voluntary contributions, since Michigan also has a statute providing that "all conveyances ... transfers or assignments ... of goods, chattels or things in action, made in trust for the use of the person making the same, shall be void, as against the creditors existing or subsequent, of such person." Mich.Comp.Laws § 566.131.[4] If Michigan's ERISA exemption statute were partially or totally inapplicable, the Debtors might still prevail if they could establish that the plan's anti-alienation provision is enforceable under Michigan common law.[5] For

ERISA, "each pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1).

**2.** Pursuant to 26 U.S.C. § 401(a)(13), "[a] trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated."

**3.** Several courts have held that ERISA preempts state exemption laws which directly affect plans subject to ERISA. *See e.g., In re Siegel,* 105 B.R. 556, 564 (D.Ariz.1989); *In re Majul,* 119 B.R. 118, 119 (Bankr.W.D.Tex.1990) (King, J.); *In re Starkey,* 116 B.R. 259, 263–64 (Bankr.D.Colo. 1990) (Matheson, J.); *In re Schlein,* 114 B.R. 780, 783 (Bankr.M.D.Fla.1990) (Proctor, J.); *In re Messing,* 114 B.R. 541, 545, 20 B.C.D. 819, 23 C.B.C.2d 650 (Bankr.E.D.Tenn.1990); *In re Conroy,* 110 B.R. 492, 496 (Bankr.D.Mont.1990); *In re Burns,* 108 B.R. 308, 311, 21 C.B.C.2d 1468 (Bankr.W.D.Okla.1989); *In re Alagna,* 107 B.R. 301, 317 (Bankr.D.Colo.1989) (Brooks, J.); *In re Bryant,* 106 B.R. 727, 730 (Bankr.M.D.Fla.1989) (Paskay, J.); *In re Weeks,* 106 B.R. 257, 262, 21 C.B.C.2d 879 (Bankr.E.D.Okla.1989); *In re Gaines,* 106 B.R. 1008, 1017, 21 C.B.C.2d 937 (Bankr.W.D.Mo.1989); *In re Flindall,* 105 B.R. 32, 38 (Bankr.D.Ariz.1989); *In re Komet,* 104 B.R. 799, 800 (Bankr.W.D.Tex.1989) (Clark, J.); *In re McLeod,* 102 B.R. 60, 64 (Bankr.S.D.Miss. 1989); *In re Brown,* 95 B.R. 216, 218 (Bankr.N. D.Okla.1989). *Contra In re Volpe,* 120 B.R. 843, 847 (W.D.Tex.1990); *In re Dyke,* 119 B.R. 536,

539 (S.D.Tex.1990); *In re Barlage,* 121 B.R. 352 (Bankr.D.Minn.1990); *In re Seilkop,* 107 B.R. 776, 778 (Bankr.S.D.Fla.1989) (Weaver, J.); *In re Bryan,* 106 B.R. 749, 751 (Bankr.S.D.Fla.1989) (Britton, J.).

**4.** This argument may be unavailing, since specific statutes generally control over more general provisions such as Mich.Comp.Laws § 566.131. *See Morton v. Mancari,* 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974); Sutherland Stat Const § 51.05 (4th ed. 1990).

**5.** Some cases have held that anti-alienation provisions contained in employee benefit plans which are wholly funded by the employer are enforceable under Michigan spendthrift trust law. *See Jacobs v. Shields,* 116 B.R. 134, 138 (D.Minn.1990); *In re Watkins,* 95 B.R. 483, 490 (W.D.Mich.1988). To similar effect, *see In re Cates,* 73 B.R. 874, 877 (Bankr.D.Or.1987) (interpreting Oregon law); *In re Wallace,* 66 B.R. 834, 840–41 (Bankr.E.D.Mo.1986) (Missouri law); *In re Elsea,* 47 B.R. 142, 149 (Bankr.E.D.Tenn. 1985) (Tennessee law); *In re Kwaak,* 42 B.R. 599, 602 (Bankr.D.Me.1984) (Maine law); *Hines v. Sands,* 312 S.W.2d 275 (Tex.1958) (Texas law); *Fordyce v. Fordyce,* 80 Misc.2d 909, 365 N.Y.S.2d 323 (1974) (New York law). As evidenced by the cases cited *supra* pp. 233–234, however, several courts have reached a contrary conclusion in applying the law of other jurisdic-

the reasons which follow, however, we need not address any of these issues, as we hold that the plan's anti-alienation provision is in any event enforceable under ERISA, and that ERISA constitutes "applicable nonbankruptcy law" for purposes of § 541(c)(2).

■ It is well-settled that, state law to the contrary notwithstanding, an anti-alienation clause contained in an ERISA-qualified pension plan precludes creditors of a plan beneficiary from levying on the beneficiary's interest in the plan. *General Motors v. Buha,* 623 F.2d 455, 463 (6th Cir. 1980); *see also Guidry v. Sheet Metal Workers Nat'l Pension Fund,* 493 U.S. 365, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990) (stating that 29 U.S.C. § 1056(d)(1) "erects a general bar to the garnishment of pension benefits from plans covered by" ERISA, 493 U.S. at ——, 110 S.Ct. at 685, 107 L.Ed.2d at 792, and ruling that the same section likewise prohibits imposition of a constructive trust, a remedy which the court characterized as indistinguishable in substance from a writ of garnishment, *id.*). Since ERISA is "nonbankruptcy law," and it is clearly "applicable" to the issue in dispute, it would seem that Mrs. Idalski's interest in the plan would accordingly be excluded from the estate in its entirety under § 541(c)(2). Nevertheless, a good number of cases have concluded that, in using the term "applicable nonbankruptcy law," Congress did not mean ERISA. In so holding, these cases have primarily relied on the statute's legislative history. Before launching into an exhaustive analysis of non-statutory material, however, we believe a court must always consider whether reference to such sources is appropriate under the circumstances.

■ There is support for the proposition that, if a literal construction of an unam-

biguous statute does not produce an absurd or futile result, then it is inappropriate for a court to examine extrastatutory materials in an effort to determine the "legislative intent" of the statute. *See Arbour v. Jenkins,* 903 F.2d 416, 421 (6th Cir.1990); *Allen v. Secretary of Health & Human Services,* 833 F.2d 602, 605 (6th Cir.1987); *United Metal Products v. National Bank of Detroit,* 811 F.2d 297 (6th Cir.1987); *E.E.O.C. v. Wooster Brush Co. Employees Relief Ass'n,* 727 F.2d 566, 577 (6th Cir. 1984); *Wetter Mfg. Co. v. United States,* 458 F.2d 1033, 1035 (6th Cir.1972). Indeed, the Fourth Circuit relied on this so-called "plain meaning rule" in holding that the term "applicable nonbankruptcy law" includes ERISA. *In re Moore,* 907 F.2d 1476, 1478–79 (4th Cir.1990).

As the court pointed out in *Moore,* the Supreme Court has explicitly endorsed the plain meaning rule. In *Davis v. Michigan Dept. of Treasury,* 489 U.S. 803, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989), the Court stated that "[l]egislative history is irrelevant to the interpretation of an unambiguous statute." 489 U.S. at 809, 109 S.Ct. at 1504 n. 3, 103 L.Ed.2d at 901 n. 3. Other decisions of the Supreme Court attest to the omnipresence of the plain meaning rule. *See, e.g., Board of Education of the Westside Community Schools v. Mergens,* —— U.S. ——, ——, 110 S.Ct. 2356, 2365, 110 L.Ed.2d 191, 208 (1990); *K–Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 293 n. 4, 108 S.Ct. 1811, 1818 n. 4, 100 L.Ed.2d 313 (1988); *Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984); *TVA v. Hill,* 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296 n. 29, 57 L.Ed.2d 117 (1978).

However, the Supreme Court also explicitly rejected the plain meaning rule on nu-

---

tions. Moreover, the plan at issue here was funded by Mrs. Idalski, not her employer, and her contributions were truly voluntary, i.e., her continued employment was not conditioned on participation in the plan. *See In re Cook,* 43 B.R. 996, 1001 (N.D.Ind.1984) (where the court specifically relied on fact that the debtor/employee's contributions to an employer-sponsored retirement plan were required by the employer in holding that the plan was not self-settled);

*SSA Baltimore Fed'l Credit Union v. Bizon,* 42 B.R. 338, 346 (D.Md.1984) (stating that, because the debtor "had no choice in connection with his or the government's contributions ..., the funds ... do not constitute a self-settled trust"); *cf. In re Sanders,* 89 B.R. 266, 270 (Bankr.S.D. Ga.1988) (noting that the debtor's "participation in the [employee benefit] plan is completely voluntary and his continued employment ... is not conditioned on participation.").

merous occasions. *See, e.g., Public Citizen v. United States Dept. of Justice,* 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377, 392 (1989); *Edwards v. Aguillard,* 482 U.S. 578, 594, 107 S.Ct. 2573, 2583, 96 L.Ed.2d 510 (1987); *United States v. James,* 478 U.S. 597, 606, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483 (1986); *Watt v. Alaska,* 451 U.S. 259, 266, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981); *Train v. Colorado Public Interest Research Group,* 426 U.S. 1, 9–10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976); *United States v. American Trucking Associations,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940). Adding to the confusion, at least two other Supreme Court opinions appear to be self-contradictory with regard to this rule of construction.

In *United States v. Rutherford,* 442 U.S. 544, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979), the Court stated that "[i]f a legislative purpose is expressed in 'plain and unambiguous language, . . . the . . . duty of the courts is to give it effect according to its terms.'" *Id.* at 551, 99 S.Ct. at 2475 (quoting *United States v. Lexington Mill & Elevator Co.,* 232 U.S. 399, 409, 34 S.Ct. 337, 340, 58 L.Ed. 658 (1914)). In refusing to create an implicit exception to the statute in question, however, the Court in *Rutherford* cited the statute's legislative history to support its conclusion. *Id.* 442 U.S. at 552, 99 S.Ct. at 2475. *See also United States v. Ron Pair Enterprises,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (where the Court again gave a ringing endorsement of the plain meaning rule, 489 U.S. at 241, 109 S.Ct. at 1030, but proceeded to review the legislative history of a statute whose meaning was "plain" to determine if it was one of those "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters." *Id.* at 242, 109 S.Ct. at 1031 (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). A number of other decisions ren-

dered by the Supreme Court vividly reflect the court's indecisiveness as to the validity of the plain meaning rule. *See California v. American Stores Co.,* —— U.S. ——, ——, 110 S.Ct. 1853, 1861, 109 L.Ed.2d 240, 255 (1990) ("Although we do not believe the statutory language is ambiguous, we nonetheless consider the legislative history . . . ."); *John Doe Agency v. John Doe Corp.,* 493 U.S. 146, 110 S.Ct. 471, 107 L.Ed.2d 462 (1989) ("If, despite what we regard as the plain meaning of the statutory language, it were necessary or advisable to examine the legislative history . . . we would reach the same conclusion."); *Bourjaily v. United States,* 483 U.S. 171, 178–79, 107 S.Ct. 2775, 2780, 97 L.Ed.2d 144 (1987) (where the Court stated that "[i]t would be extraordinary to require legislative history to *confirm* the plain meaning of [Federal Rule of Evidence] 104," then proceeded to review the rule's legislative history); *United Airlines v. McMann,* 434 U.S. 192, 199, 98 S.Ct. 444, 448, 54 L.Ed.2d 402 (1977) ("The dissent relies heavily upon the legislative history, which by traditional canons of interpretation is irrelevant to an unambiguous statute. However, in view of the [dissent's] recourse to the legislative history[,] we turn to that aspect to demonstrate the absence of any indication of congressional intent. . . .").

Under the principle of *stare decisis,* we are of course obligated to adhere to decisions rendered by the Supreme Court. This principle has been described as a means of promoting "certainty, stability, and predictability of the law." 20 Am-Jur2d, *Courts,* § 184; *see also* 1B J. Moore, J. Lucas and T. Currier, *Moore's Federal Practice* ¶ 0.401 (2d ed. 1990). Unfortunately, the ambivalence which the Supreme Court has demonstrated on the question of the plain meaning rule leads us to conclude that "certainty" will not be served by adhering to any of the Court's conflicting pronouncements.[6] Similarly, we are

---

**6.** Other courts have also struggled with the Supreme Court's schizophrenic attitude vis-a-vis the plain meaning rule. *See, e.g., In re Sinclair,* 870 F.2d 1340, 1341–42 (7th Cir.1989); *In re*

*Keinath Bros. Dairy Farm,* 71 B.R. 993, 996–1004, 16 B.C.D. 53 (Bankr.E.D.Mich.1987). Contrary to the court in *Sinclair,* however, we do not believe that the various positions taken by

unable to discern any direction on this issue from our own circuit court; the Sixth Circuit cases cited earlier, which support the plain meaning rule, are contradicted by a good number of cases from that court which explicitly or implicitly reject the plain meaning rule. *See, e.g., United States v. Avant,* 907 F.2d 623, 625 (6th Cir.1990); *United States v. Hagen,* 869 F.2d 277, 279 (6th Cir.1989); *United States v. Johnson,* 855 F.2d 299, 306 (6th Cir.1988); *In re Ron Pair Enterprises,* 828 F.2d 367, 369–70 (6th Cir.1987), *rev'd,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *United States v. Underhill,* 813 F.2d 105, 111–12 (6th Cir.1987); *Bowman v. Stumbo,* 735 F.2d 192, 197 (6th Cir.1984). Since there is no clear precedent in this regard, we are in effect writing on a clean slate, and we will analyze the problem accordingly.

As a starting point, we note that virtually all courts agree that the legislative history of a statute is potentially useful in determining what Congress "meant" the statute to say; few courts, after all, have suggested that it is pointless to consult the legislative history even if the meaning of a statute is unclear. That being the case, the question becomes, why should the court ever refuse to consider evidence that may substantiate a statutory construction which a party claims most accurately reflects the legislative intent?

The presumed response by advocates of the plain meaning rule is that, given the inherent limitations of the legislative history,[7] it can never persuade the court that an unambiguous statute means other than what it appears to mean. We believe, however, that there are two problems with this response. First, we tend to agree with those who have questioned whether a statute can ever be fairly characterized as "unambiguous." *See* Jones, *The Plain Meaning Rule and Extrinsic Aids in the Interpretation of Federal Statutes,* 25 Wash.U. L.Q. 2 (1939); Grabow, *Congressional Silence and the Search for Legislative Intent: a Venture into "Speculative Unrealities",* 64 Boston U.L.Rev. 737, 738 n. 3 ("The fundamental flaw of the plain meaning rule is its reliance on the notion that words can have a fixed, unambiguous meaning independent of the context in which they are used.").[8] We are accordingly reluctant to pledge our unquestioning faith to the so-called "literal" meaning of a statute.

Second, and more importantly, we do not accept the premise that legislative histories are of so little value that they could (or should) *never* persuade the court that Congress did not intend a statute to be interpreted literally. To the contrary, we believe that there are a number of examples where a court has appropriately declined to apply the "plain meaning" of a statute, based at least in part on the court's analysis of the statute's legislative history. *See, e.g., Church of the Holy Trinity v. United States,* 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892) (statute which prohibited the importation of foreigners to perform "labor or service of any kind" was directed toward manual laborers and thus did not apply to a contract between a church in the United States and a pastor residing in England); *In re Hudson,* 859 F.2d 1418, 1423–24 (9th Cir.1988) (holding that a provision in the Bankruptcy Code which excepted from discharge debts arising from a drunk driving judgment included judgments entered after

the Supreme Court can be satisfactorily reconciled.

7. Legislative histories have been criticized as unauthoritative, *Public Citizen v. United States Dept. of Justice,* 491 U.S. 440, 470–71, 109 S.Ct. 2558, 2575, 105 L.Ed.2d 377, 403 (1989) (concurring opinion); *Hirschey v. F.E.R.C.,* 777 F.2d 1, 7–8 (D.C.Cir.1985) (concurring opinion), and it has been suggested that they are unreliable, easily manipulated and subject to abuse. *See Blanchard v. Bergeron,* 489 U.S. 87, 109 S.Ct.

939, 946–47, 103 L.Ed.2d 67 (1989) (concurring opinion); *Sinclair,* 870 F.2d at 1343; Dickerson, *Statutory Interpretation: Dipping Into Legislative History,* 11 Hofstra L.Rev. 1125, 1130 (1983).

8. Indeed, the very fact that ambiguity appears to be in the eye of the beholder, *see e.g., United States v. Ron Pair Enterprises,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (5–4 split as to whether the statute in question was unambiguous), suggests that it is something of an illusory concept.

the debtor filed a petition for bankruptcy).[9] In these cases, a literal application of the statute in question would have created results that Congress never intended. *Cf. Guiseppi v. Walling*, 144 F.2d 608, 624 (2d Cir.1944) (Learned Hand, J., concurring) ("There is no surer way to misread any document than to read it literally...").

Another argument which can be made in support of the plain meaning rule is that it limits the ability of judges to make value judgments that should properly be made by the legislature. *See Public Citizen*, 491 U.S. at 471–74, 109 S.Ct. at 2575–76, 105 L.Ed.2d at 403–04 (concurring opinion). Moreover, by relying on the statute's "plain meaning," legislators are encouraged to "spell out the nature of their intentions much more clearly on the face of the statutes they pass," and the court's task is simplified. Macey, *Promoting Public–Regarding Legislation Through Statutory Interpretation: An Interest Group Model.* 86 Columbia L.Rev. 223, 264 (1986). Compliance on the part of those persons "whose conduct is supposed to be influenced by the law" may also be facilitated if they are not expected or required to "delv[e] into legislative recesses" in order to determine a statute's meaning. *In re Sinclair*, 870 F.2d 1340, 1343 (7th Cir. 1989).

The problem with the first argument is that it assumes that judges who are inclined to manipulate the law to suit their own biases will be constrained to a significant extent by the plain meaning rule. We think that assumption is overly optimistic, given the remarkable skill that some courts have demonstrated in detecting "ambiguities" in a statute where most would have thought none existed.[10] In short, we do not think the plain meaning rule effectively curbs the propensity or ability of judges to circumvent the legislative will.

As for the remaining arguments cited above, we believe that any positive effect that strict adherence to the plain meaning rule would have on either the manner in which statutes are drafted or the extent to which they are obeyed is speculative, at best.[11] More to the point, we think that neither these (theoretical) benefits nor the "simplicity" of adhering to a statute's literal meaning would ordinarily justify incurring the risk that seemingly unambiguous statutory provisions will be applied in a manner that Congress did not intend.

■ Nevertheless, we do agree that there are situations where the risk of misconstruing an unambiguous statute is so minimal that the benefits gained by invoking the plain meaning rule justify its use. Accordingly, we believe that the rule should be applied where the statutory construction urged by a party is so inherently improbable that it defies common sense.

If, for example, a statute says "the requirements set forth herein do not apply to A," and a party contends that Congress meant to say that the requirements *do*

---

**9.** Although the court in *Hudson* characterized the relevant statutory provision as "ambiguous" with regard to the "timing of the reduction of a claim to 'judgment,'" 859 F.2d at 1421, we agree with the Ninth Circuit Bankruptcy Appellate Panel (whose decision *Hudson* reversed) that the statute is "clear" in this respect and, if literally applied, would relate only to pre-petition judgments. *In re Hudson*, 73 B.R. 649, 653 (9th Cir. B.A.P.1987). *See In re Rose*, 86 B.R. 86, 88–90 (Bankr.E.D.Mich.1988).

**10.** We also note that some judges are able to uncover the "clear" meaning of a statute that appears more hazy to less talented jurists. In *Ron Pair, supra,* for example, the Supreme Court's conclusion that § 506(b) of the Bankruptcy Code permitted oversecured involuntary lienholders to recover post-petition interest on their claims was based in large part on the "plain language of the statute." 489 U.S. at 242, 109 S.Ct. at 1031. The statute's meaning was apparently less "plain" to the four dissenting justices, the Sixth Circuit and the bankruptcy court, each of which concluded to the contrary in that case, as well as the First Circuit, which reached the same conclusion as the Sixth Circuit in *In re Newbury Cafe, Inc.,* 841 F.2d 20 (1st Cir.1988).

**11.** With respect to the drafting of statutes, we find merit in the argument that it would in any event be unreasonable to expect the legislature to enact statutes which are devoid of ambiguity. *See* Nutting, *The Ambiguity of Unambiguous Statutes,* 24 Minn.L.Rev. 509, 521 (1940) ("Anyone who has had experience in the drafting of instruments, whether statutes or contracts, knows the impossibility of creating phrases which are free from doubt.")

apply to A, the party is, in essence, asking the court to find that Congress, through its statute, said the exact opposite of what it meant. As a means of expediting the judicial process, we believe it is appropriate for the court to exclude non-statutory evidence which is claimed to support such an "interpretation." [12]

In such a situation, application of the plain meaning rule is justified because we are confident that no amount of legislative history could persuade the court that the legislature "meant" other than what the statute appears to be "saying." [13] Alternatively, we believe it is appropriate to take the position that the court simply will not construe a statute in such a nonsensical manner, even if such a construction would in fact accurately reflect the intent of the legislature. We concur with the view stated long ago that, in interpreting statutes, the plain meaning rule should operate in a manner analogous to the parol evidence rule applicable to private contracts, and that the intent of the legislature, as established by review of extra-statutory materials, should accordingly be "relevant to the solution of the case only if consistent with the 'meaning' which may *reasonably* be attached to the words used" in the statute. Nutting, *The Ambiguity of Unambiguous Statutes*, 24 Minn.L.Rev. 509, 521 (1940) (emphasis added).

If, on the other hand, a party concedes that the hypothetical statute excludes A from its coverage, but contends that Congress did not intend to include some subset of A within the scope of the exclusion, we do not believe that the court should ignore evidence which the party claims supports

her case. Because the party's premise, that Congress inadvertently used an overly broad term, is at least plausible, the court cannot dismiss the possibility that the party will be able to support her argument with persuasive evidence. [14]

Applying this rationale to the case before us, we do not believe that the plain meaning "rule" should be invoked here. We cannot say with confidence that no amount of evidence, by way of legislative history or other extra-statutory materials, could convince us that Congress did not mean to include ERISA when it referred to "applicable nonbankruptcy law" in § 541(c)(2). [15] We will accordingly consider the legislative history which the trustee claims supports his position.

The House Report indicates that the reference to "applicable nonbankruptcy law" found in § 541(c)(2) "preserves restrictions on transfer of a spendthrift trust to the extent that the restriction is enforceable under applicable nonbankruptcy law." H.Rep. No. 95–595, 95th Cong., 1st Sess. 369 (1977), 5 U.S.Code Cong. Admin.News, 1978, pp. 5787, 6325. The report also states that § 541(c)(2) "continues over the exclusion from property of the estate of the debtor's interest in a spendthrift trust to the extent the trust is protected from creditors under applicable state law." *Id.* Similarly, the Senate Report states that § 541(c)(2) "preserves restrictions on a transfer of a spendthrift trust...." S.Rep. No. 95–989, 95th Cong.2d Sess. 83 (1978), 5 U.S.Code Cong. Admin.News, 1978, p. 5869.

Based on the foregoing statements in the legislative history, the court in *In re Goff,*

---

**12.** Although it seems unlikely that anybody would make an argument along the lines suggested in this hypothetical, such cases do arise. *See, e.g., Keinath Bros. Dairy Farm,* 71 B.R. at 1004 (Where this Court refused to consider legislative history which the debtor claimed would show, in effect, that "when Congress *said* that pending cases MAY NOT be converted to Chapter 12, it *meant to say* that pending cases MAY be converted to Chapter 12.")

**13.** This hypothetical assumes that the party is not claiming that the statute contains a typographical error; since there is nothing implausi-

ble about such a claim, evidence in support of the contention should of course be considered.

**14.** Other examples where we believe that the plain meaning rule should not be invoked would include situations where a party contends that the statute was (or was not) meant to exclude only A, that A has a technical meaning that differs from its lay definition, and so on.

**15.** Indeed, the fact that numerous other courts have so held is itself an indication that such an interpretation of § 541(c)(2) is not unreasonable.

706 F.2d 574 (5th Cir.1983), concluded that "it is clear that Congress intended by its reference to 'applicable nonbankruptcy law' to exempt from the estate only those 'spendthrift trusts' traditionally beyond the reach of creditors under state law." *Id.* at 582. Several other circuits reached the same conclusion as the court in *Goff.* *See In re Daniel,* 771 F.2d 1352 (9th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986); *In re Lichstrahl,* 750 F.2d 1488 (11th Cir.1985); *In re Graham,* 726 F.2d 1268 (8th Cir.1984); *Regan v. Ross,* 691 F.2d 81 (2d Cir.1982); *see also McLean v. Central States, S. & S. Areas Pen. Fund,* 762 F.2d 1204 (4th Cir.1985) (in which the court arguably implied that § 541(c)(2) refers only to state law).[16]

■ Although the legislative history cited above shows that Congress intended to include state law regarding spendthrift trusts within the scope of the term "applicable nonbankruptcy law," we think it takes a certain leap of faith to infer from that fact that Congress also meant to *exclude* federal spendthrift trust law. *Cf. Moore,* 907 F.2d at 1479 (characterizing the legislative history as "inconclusive"). The court should refrain from construing a statute in a manner which does not comport with its apparent meaning unless there is strong evidence to support such a construction. *See United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) ("If the statutory language is unambiguous, in the absence of 'a *clearly expressed* legislative intent to

the contrary, that language must ordinarily be regarded as conclusive.' " (citation omitted; emphasis added)); *United States v. Apfelbaum,* 445 U.S. 115, 121, 100 S.Ct. 948, 952, 63 L.Ed.2d 250 (1980) ("It is a well-established principle of statutory construction that absent *clear evidence* of a contrary legislative intention, a statute should be interpreted according to its plain language." (emphasis added)). We find nothing in the legislative history which *clearly* indicates that the reference to applicable nonbankruptcy law contained in § 541(c)(2) does not include restrictions which are enforceable under applicable federal law.[17]

The court in *Goff* stated that "the other provisions of the Code negate [the contention that federal law is within the scope of § 541(c)(2)] because the Code explicitly makes reference to 'federal law' or pension laws, including ERISA, when federal as opposed to state law is the subject of the reference." 706 F.2d at 582. However, we think it is perfectly logical for Congress to use the term "federal" law when it meant only federal law, and yet refer simply to "nonbankruptcy law" when the federal/state law distinction was irrelevant. We therefore fail to see how references elsewhere in the Code to federal law "negate" the conclusion that § 541(c)(2) includes applicable federal law.

■ Contrary to *Goff,* we believe that other provisions in the Code actually lend support for the contention that § 541(c)(2) includes federal as well as state law. The

---

**16.** Many bankruptcy and district courts in other circuits have likewise concluded that an ERISA-qualified plan is not excluded from the bankruptcy estate under § 541(c)(2) unless it meets state law requirements with respect to spendthrift trusts. *See, e.g., In re Gribben,* 84 B.R. 494, 496 (S.D.Ohio 1988); *Cook,* 43 B.R. at 1000; *In re Groves,* 120 B.R. 956, 960 (Bankr.N.D.Ill. 1990) (Ginsberg, J.); *In re McIntosh,* 116 B.R. 277, 278 (Bankr.N.D.Okla.1990); *In re Petrey,* 116 B.R. 95, 99 (Bankr.S.D.Ohio 1990); *Starkey,* 116 B.R. at 262; *In re Martin,* 115 B.R. 311, 316 (Bankr.D.Utah 1990); *In re Balay,* 113 B.R. 429, 436 (Bankr.N.D.Ill.1990) (Schwartz, J.); *Burns,* 108 B.R. at 312; *In re Smith,* 103 B.R. 882, 884 (Bankr.N.D.Ohio 1989); *Watkins,* 95 B.R. at 487–88; *In re LaFata,* 41 B.R. 842, 843 (Bankr.E.D.Mich.1984).

**17.** In addition to the legislative history already discussed, the court in *Goff,* cited a passage from the report of the Commission on the Bankruptcy Laws of the United States. 706 F.2d at 581 n. 19. In the passage excerpted by the court, the commission recommended that the debtor's interest in a state spendthrift trust be included in the bankruptcy estate (a recommendation which was, of course, rejected), and exempted only to the extent necessary to provide for the debtor's reasonable support. The court in *Goff* indicated that this passage "is illuminating and reinforces the already-apparent House intent that § 541(c)(2) be directed narrowly toward traditional 'spendthrift' trusts." *Id.* We believe, however, that this "evidence" adds little or nothing to support the holding in *Goff.*

term "applicable nonbankruptcy law" is not unique to § 541(c)(2); it appears throughout the Code in a wide variety of contexts. *See* 11 U.S.C. §§ 101(56)(F), 108(a), 108(c), 363(f)(1), 365(c)(3), 365(h)(1), 365(n)(1), 365(n)(2), 365(n)(4), 510(a), 522(b)(2)(B), 524(c), 541(c)(1), 552(b), 927, 943(b)(6), 1123(a), 1125(d), 1126(b)(1), 1142(a); *see also* 28 U.S.C. § 1411. There is no readily apparent basis for concluding that the term, as used in these various provisions, refers exclusively to state law, nor are we aware of any decision in which a court has so held. As noted by the court in *Moore*, in fact, courts have specifically ruled that certain of these provisions encompass applicable federal law. *Moore*, 907 F.2d at 1477–78. We therefore agree with *Moore* that a narrow construction of § 541(c)(2) violates the well-established rule which requires that the court consistently interpret words or phrases that appear in various provisions within a particular legislative act. *Moore*, 907 F.2d at 1478; *see also In re Rhein*, 73 B.R. 285, 288 (Bankr.E.D.Mich. 1987).

We are likewise unpersuaded by the contention that the limited exception allowed by § 522(d) of the Code for a debtor's interest in the pension plan demonstrates that "Congress intended that pensions provided for by federal law be insulated from bankruptcy only to the extent recognized in Section 522." *Goff*, 706 F.2d at 586. As the court in *Goff* acknowledged, "[s]ection 522(d)(10)(E) reaches a broad array of employment benefits." *Id.* at 587. *See also In re Threewitt*, 24 B.R. 927, 930, 9 B.C.D. 1225, 8 C.B.C.2d 890 (D.Kan.1982) (noting that § 522(d)(10)(E) "exempts the right to receive payments necessary for support from a wide range of sources, *tax-qualified or not*, including, for example, Christmas stock bonuses ..., or an annuity purchased to provide income to a worker disabled in an industrial accident." (footnote omitted; emphasis in original)). We therefore view § 522(d)(10)(E) as somewhat of a generic "catch-all" provision for employee benefit plans, and we agree with *Threewitt*

that there is nothing "remarkable" about the fact that its broad terms would include interests in plans that are excluded from the estate by virtue of § 541(c)(2).[18]

In further support of its conclusion that interests in an ERISA-qualified plan are not automatically excluded from the bankruptcy estate by operation of § 541(c)(2), *Goff* noted that ERISA "clearly was not intended to affect the operation of other federal law." 706 F.2d at 587. Citing the intent of the Bankruptcy Code to "broaden the 'property of the estate' available to creditors in bankruptcy and, specifically, intended to limit any exemption of pension funds," the court concluded that "[t]hese policy-based provisions of the Code would be frustrated were ERISA's anti-alienation and assignment provisions applied with a sweeping brush." *Id.*

The analysis in *Goff* is flawed, however, because it assumes the very point in question: the "policy" of the Code is compromised by ERISA's restrictions on alienation only if one concludes that Congress did not intend to include ERISA within the scope of § 541(c)(2). In fact, we believe that the argument should be reversed: by holding that the debtor's interest in an ERISA-qualified pension plan is excluded from the estate only if the plan's anti-alienation clause is enforceable under state law, the courts in *Goff*, *Daniel*, *Lichstrahl* and *Graham* have substantially undermined the express congressional objective that, with specified exceptions not relevant here, ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." 29 U.S.C. § 1144(a). Indeed, recent Supreme Court decisions have underscored the vitality of this policy. *FMC Corp. v. Holliday*, —— U.S. ——, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990) (holding that ERISA pre-empted a state law that would have prevented an employee welfare benefit plan from exercising its contractual right of subrogation on a plan participant's tort recovery); *Ingersoll–Rand v. McClendon*,

---

18. Indeed, even the court in *Goff* was untroubled by the "overlap" between § 522(d) and § 541(c)(2) insofar as ERISA-qualified plans

which meet state spendthrift trust law requirements are concerned. 706 F.2d at 587.

— U.S. ——, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990) (ERISA preempted a claim by an employee that he was discharged to preclude recovery of plan benefits, in violation of state common law).

In these cases, the Supreme Court emphasized that ERISA's preemption clause is to be broadly construed, and that the clause was "intended to ensure that plans and plan sponsors would be subject to a *uniform body of benefit law.*" *Ingersoll-Rand,* 111 S.Ct. at 484 (emphasis added). Yet, if § 541(c)(2) is read as including only state law, the fate of ERISA-qualified plans in bankruptcy will vary from state to state, a result which is clearly inconsistent with the congressional desire for uniformity in the administration of employee pension plans.[19] This inconsistency was noted in the concurring opinion in *In re Kincaid,* 917 F.2d 1162 (9th Cir.1990), where Judge Fletcher questioned the Ninth Circuit's decision in *Daniel,* based in part on the "sweeping preemptive effect granted

ERISA in post-*Daniel* Supreme Court cases." *Id.* at 1170 n. 1.[20]

Although defending the *Daniel* decision, even the *Kincaid* majority acknowledged

> a certain incongruity in the notion that [, because of ERISA's broad preemptive effect on state law,] only ERISA's anti-alienation provisions offer protection until bankruptcy, and only state spendthrift provisions do so in bankruptcy. The same might be said of the idea that some ERISA plan benefits are protected from creditors before bankruptcy and lose that protection upon bankruptcy.

917 F.2d at 1166. As suggested by the court in *In re Majul,* 119 B.R. 118, 123 n. 5 (W.D.Tex.1990), one stark example of the "incongruity" resulting from the decision of *Goff* and its progeny is that the anti-alienation protection offered by ERISA would continue to be available to a convicted embezzler,[21] but could be denied to an honest debtor in bankruptcy.[22]

---

19. More specifically, of course, such a construction allows states to carve out an exception to ERISA's prohibition on alienation of plan benefits that Congress, in enacting ERISA, did not permit. If § 541(c)(2) is interpreted in accordance with its literal meaning, on the other hand, no such conflicts are created. This fact in itself suggests that a "broad" interpretation of § 541(c)(2) is appropriate, in light of a court's duty to avoid construing a statute in a manner which impairs the effectiveness of other statutory provisions unless there is a "clearly expressed congressional intention" that the statute in question be so construed. *Morton,* 417 U.S. at 551, 94 S.Ct. at 2483, 41 L.Ed.2d 290 (1974). As already discussed, Congress has not "clearly expressed" an intention to restrict the scope of § 541(c)(2) to applicable state law.

20. Judge Fletcher focused on Supreme Court cases decided subsequent to *Daniel.* We note, however, that in cases decided prior to *Daniel,* some courts were able to uncover evidence of ERISA's "sweeping preemptive effect." In *In re Mosley,* 42 B.R. 181 (Bankr.D.N.J.1984), for example, the court questioned *Goff's* conclusion that

> although Congress had [through ERISA] ... eliminated the effect of state attachment and exemption statutes on pensions in 1974, Congress chose in the Bankruptcy Code of 1978 to revive the effect of state attachment and exemption statutes on pensions. This court finds this very unlikely in view of the great importance which the legislature had seen in relieving pension plans from state regulation.

42 B.R. at 191.

21. *See Guidry v. Sheetmetal Workers Nat'l Pension Fund,* 493 U.S. 365, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990) (holding that § 206(d)(1) of ERISA (29 U.S.C. § 1056(d)(1)) precludes imposition of a constructive trust on pension benefits payable to a former union pension fund trustee convicted of stealing funds from the union); *see also United Metal Products v. National Bank of Detroit,* 811 F.2d 297, 300 (6th Cir.1987) ("there is no fraud exception to ERISA's anti-alienation provision, 29 U.S.C. § 1056(d) ... due to an employee's fraudulent or criminal conduct directed against an employer").

22. Although conceding that, by narrowly construing § 541(c)(2), the bankruptcy trustee, as a representative of the debtor's creditors, will be able to reach funds to which creditors would not have direct access in a nonbankruptcy setting, some courts have justified this discrepancy on the grounds that "the policies behind a given limitation or restriction applicable to a creditor seeking garnishment may not be equally applicable in the bankruptcy context." *In re Ridenour,* 45 B.R. 72, 78, 11 C.B.C.2d 1086 (Bankr.E.D.Tenn.1984) (citing *Kokoszka v. Belford,* 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974)); *see also In re DiPiazza,* 29 B.R. 916, 921, 10 B.C.D. 618, 8 C.B.C.2d 654 (Bankr.N.D.Ill.1983). However, these courts ignore the fact that, unlike *Kokoszka,* a pre-Code case, the issue here involves construction of a statute which by its very terms would make the trustee subject to the same limitations as would a creditor outside of bankruptcy.

It appears that *Goff* did not fully anticipate such anomalies, as the court seems to have assumed that protection against alienation of ERISA benefits would only be denied to debtors with significant control over the assets of the plan, such as the Goffs were able to exercise with their self-employed Keogh plans. *See Goff*, 706 F.2d at 589. In this regard, it is interesting to note that most of the other circuit court cases which narrowly construed § 541(c)(2) also involved trusts that were established by a corporation controlled by the debtor. *See Daniel*, 771 F.2d at 1353 (plan established by professional corporation of which debtor was "sole director and shareholder"); *Lichstrahl*, 750 F.2d at 1489 (same); *Graham*, 726 F.2d at 1269 (same). A motivating factor behind the strained interpretation these courts have given to § 541(c)(2) may therefore have been the desire to avoid what the courts perceived to be an unjust result. *See also In re Ridenour*, 45 B.R. 72, 78, 11 C.B.C.2d 1086 (Bankr.E.D. Tenn.1984) ("Holding the § 541(c)(2) exclusion applicable to all ERISA-qualified pension plans ... would permit [exclusion from the estate of] essentially a self-settled spendthrift trust, a device clearly not permitted under the traditional law of spendthrift trusts.").

If some of these decisions are in fact attributable in part to the court's desire to "do equity," the ultimate irony is that the perceived injustice—the establishment of creditor-proof self-settled spendthrift trusts—is clearly permissible so long as the plan complies with the requirements specified in ERISA. *See, e.g., Commercial Mortgage Ins. v. Citizens Nat'l Bank*, 526 F.Supp. 510, 518–19 (N.D.Tex.1981) (noting that ERISA was "intended to eliminate the discrimination in retirement laws against the self-employed," and rejecting the contention that Congress did not intend to protect from garnishment trusts which are "established by a professional association for the benefit of the sole director. and shareholder"). Moreover, the Supreme Court in *Guidry, supra*, stated that it was inappropriate for the courts to fashion a "generalized equitable exception" to ERISA's anti-alienation provision, and that

it was instead the prerogative of Congress to identify any such exceptions. 493 U.S. at ——, 110 S.Ct. at 687, 107 L.Ed.2d at 795. It would indeed be difficult to reconcile, on the one hand, a judicially created exception to ERISA's prohibition against alienation of benefits where the plan is self-settled, with *Guidry*'s holding that embezzlement does not constitute a basis for such an exception.

Furthermore, *Goff* may well have been incorrect in assuming that an employer-created-and-controlled ERISA-qualified pension plan, would generally qualify as a spendthrift trust under state law. There is substantial authority for the proposition that anti-alienation provisions in employee benefit plans are unenforceable under state law to the extent that the plan is funded by voluntary employee contributions, on the theory that the plan is in essence self-settled. *See In re Kincaid*, 96 B.R. 1014, 1019 (9th Cir. B.A.P.1989), *rev'd*, 917 F.2d 1162 (9th Cir.1990); *In re Threet*, 118 B.R. 805, 808 (Bankr.N.D.Okla.1990); *In re Martin*, 115 B.R. 311, 316–17 (Bankr.D. Utah 1990); *In re Weeks*, 106 B.R. 257, 261, 21 C.B.C.2d 879 (Bankr.E.D.Okla. 1989); *In re Sanders*, 89 B.R. 266, 270 (Bankr.S.D.Ga.1988); *In re Cassada*, 86 B.R. 541, 545, 17 B.C.D. 855 (Bankr.E.D. Tenn.1988); *In re Cates*, 73 B.R. 874, 876 (Bankr.D.Or.1987); *In re Wallace*, 66 B.R. 834, 841 (Bankr.E.D.Mo.1986); *In re Berndt*, 34 B.R. 515, 518, 9 C.B.C.2d 848 (Bankr.N.D.Ind.1983); *In re Werner*, 31 B.R. 418, 420–21, 10 B.C.D. 1117, 9 C.B. C.2d 371 (Bankr.D.Minn.1983); *In re Threewitt*, 20 B.R. 434, 438 (Bankr.D.Kan.), *rev'd on other grounds*, 24 B.R. 927 (D.Kan.1982); *Fordyce v. Fordyce*, 80 Misc.2d 909, 365 N.Y.S.2d 323, 328 (Sup.Ct. 1974); *see also In re Tomer*, 117 B.R. 391, 394 (Bankr.S.D.Ill.1990) (stating in dictum that, but for a statutory "exception to the traditional rule against self-settled or beneficiary created spendthrift trusts ..., the member accumulation portion of the [employee pension] plan would not qualify as a [traditional] spendthrift trust"). *Contra Highlands State Bank v. Gonzales*, 340 S.W.2d 828 (Tex.Ct.App.1960).

In fact, some courts have suggested or implied that even employer-funded trust plans are self-settled, since contributions are made in consideration of services rendered by the employee. *See In re McIntosh,* 116 B.R. 277, 279 (Bankr.N.D.Ill. 1990); *In re Fritsvold,* 115 B.R. 192, 195 (Bankr.D.Minn.1990) (where the court held that the anti-alienation clause in the employer's retirement plan was unenforceable under Minnesota spendthrift trust law because the debtor was "clearly not a donee or testamentary beneficiary," notwithstanding the fact that the plan was partially funded by the employer); *In re Balay,* 113 B.R. 429, 438, 20 B.C.D. 545 (Bankr.N. D.Ill.1990); *In re Loe,* 83 B.R. 641, 645 (Bankr.D.Minn.1988) (where the same court that decided *Fritsvold* held that, although the profit-sharing plan in which the debtors held an interest was entirely funded by the employer, the plan's anti-alienation clause would be unenforceable under state law because "the employer's contributions ... are a form of employee compensation"); *Electrical Workers Credit Union v. IBEWNECA Holiday Trust Fund,* 583 S.W.2d 154 (Mo.1979) (where the court noted that, "[a]lthough contributions to a[n employer-sponsored] welfare fund are often not technically characterized as wages, they have been held to represent a part of the consideration being given to the workers for their services and have in certain circumstances been regarded as having the same legal effect as wages," 583 S.W.2d at 160, and concluded that the plaintiff could garnish the employer-funded trust fund because, "[i]f [the trust fund's] spendthrift clause ... were to be held enforceable, who is to say that all wages of employees could not be sheltered from the claims of creditors by similar agreements" *id.* at 162); *see also In re Boon,* 90 B.R. 988, 993 (Bankr. W.D.Mo.1987) *rev'd,* 108 B.R. 697 (W.D.Mo. 1989) ("The fiction upon which some decisions base a holding that ERISA funds are excluded from the estate—that only the employer makes contributions to the plan— amounts to a blind acceptance of the employer's disguised payments of salary." (footnote omitted)).

In an attempt to reach an "equitable" result, then, *Goff* and some of the other cases cited have inadvertently laid the foundation for a new "injustice"—the denial of protection against alienation of pension benefits payable to a debtor under an ERISA-qualified plan which is employer-created and over which the debtor exercises minimal control.

To avoid such a holding, some courts appear to be stretching the definition of a spendthrift trust under state law to accommodate the ERISA plan in question. *See, e.g., Kincaid,* 917 F.2d at 1167 (holding that an ERISA plan was not self-settled even though funded by the debtor/employee's voluntary contributions on the grounds that, because the contributions were made by payroll deductions, "the amount contributed never belongs to the employee"); *In re Elsea,* 47 B.R. 142, 149 (Bankr.E.D. Tenn.1985) (holding that the debtor's ERISA plan satisfied a state statutory requirement that the trust be "created by recorded will or registered deed" because the requirement was designed to insure "public notice of the limits on the rights of the beneficiary and his creditors," which function was satisfied by "the federal statutes [ERISA] themselves"); *see also In re Velis,* 109 B.R. 64, 68 (Bankr.D.N.J.1989) (which seems to suggest in dictum that § 541(c)(2) only excludes those ERISA plans which are "employer-created-and-controlled retirement plans").

In short, we believe that the difficulties arising from the holding in *Goff* and other cases provide a vivid example of the adage that "hard cases make bad law." We instead join *Moore* and a good number of other courts in concluding that benefits payable under an ERISA-qualified pension plan are excluded from the bankruptcy estate under § 541(c)(2). *See, e.g., Threewitt,* 24 B.R. at 929; *In re Cheaver,* 121 B.R. 665 (Bankr.D.D.C.1990) *Majul,* 119 B.R. at 124; *In re Ralstin,* 61 B.R. 502, 504–05 (Bankr.D.Kan.1986); *In re Mosley,* 42 B.R. 181, 191, 11 C.B.C.2d 85 (Bankr.D.N.J. 1984); *Warren v. G.M. Scott & Sons,* 34 B.R. 543, 544 (Bankr.S.D.Ohio 1983); *In re Holt,* 32 B.R. 767, 772, 10 B.C.D. 1267 (Bankr.E.D.Tenn.1983); *In re Pruitt,* 30

B.R. 330, 331, 10 B.C.D. 760, 8 C.B.C.2d 912 (Bankr.D.Colo.1983); *In re Rogers*, 24 B.R. 181, 183 (Bankr.D.Ariz.1982); *see also In re Leamon*, 121 B.R. 974 (Bankr.E.D.Tenn. 1990) (governmental plan not subject to title I of ERISA, but containing the anti-alienation provision mandated by 26 U.S.C. § 401(a)(13)).[23]

We believe the Sixth Circuit decision in *In re Buren*, 725 F.2d 1080, *cert. denied* 469 U.S. 818, 105 S.Ct. 87, 83 L.Ed.2d 34 (1984), provides strong support for our holding. The issue in *Buren* was whether social security benefits payable to a chapter 13 debtor comprised property of the bankruptcy estate, notwithstanding a provision of the Social Security Act which explicitly barred assignment of such benefits. The district court had held that the benefits were estate property, reasoning that to hold otherwise would (1) effectively preclude individuals whose primary income is comprised of social security benefits from filing under chapter 13, contrary to Congress' wishes (as evidenced by the legislative history to the Code), and (2) render meaningless the exemption for social security benefits provided under § 522 of the Code.

In reversing the district court, the Sixth Circuit rejected the contention that social security recipients would be denied access to relief under chapter 13 if the Social Security Act's anti-alienation provision were held effective in bankruptcy. 725 F.2d at 1086. Accordingly, it concluded that there was no "irreconcilable conflict" between the Social Security Act and the Bankruptcy Code which warranted a finding that the Act's anti-alienation provision had been repealed by implication. *Id.*

The court was also unpersuaded by the argument that § 522's explicit reference to social security benefits justified the inference that such benefits are property of the estate. In this regard, the court noted that:

> [W]hile our reading of the Code ... suggests that sections 522(b)(2)(A) and 522(d)(10) are hortatory reaffirmations of the uncontested fact that social security payments only become part of a debtor's estate if he chooses to include them, such a construction hardly presents the kind of "positive repugnancy" between [the Social Security Act's anti-assignment provision] and Chapter 13 that must exist for a court to declare a repeal by implication.

*Id.* (Citations omitted).

In contrast to the Social Security Act, ERISA's policy against alienation of benefits is, regrettably, more clearly stated in the case law than the statute itself. *See Mosley*, 42 B.R. at 188 (noting that, "[a]lthough many courts have interpreted ERISA to prohibit any type of attachment of benefits under ERISA-qualified plans, the language of the statute itself does not explicitly prohibit such attachment by creditors"). But this distinction is relevant only if courts interpreting ERISA can be said to have significantly overstated the intentions of Congress regarding alienation of plan benefits. We do not believe that to be the case. Indeed, *Buren* itself indicated that ERISA and the Social Security Act are substantially similar for purposes of analysis; noting the absence of any provision in the Code which explicitly repeals the Social Security Act's anti-alienation provision, the court cited legislative history under the Code which discusses ERISA as "evidence that Congress knew that *only an express provision could void the anti-assignment provisions of federal benefit statutes.*" 725 F.2d at 1083 (emphasis added).[24] Of course, the Code contains no such "express" provision with respect to ERISA.

---

**23.** The judges who decided *Holt* and *Pruitt* subsequently reversed themselves on this issue. *See In re Matteson*, 58 B.R. 909, 911 (Bankr.D. Colo.1986) (citing *Goff, Lichstrahl, Daniel* and *Graham* as the basis for the court's "reconsideration" of its holding in *Pruitt* ); *Ridenour*, 45 B.R. at 78 (citing the Eighth Circuit's reasoning in *Graham* as the basis for reversing the position taken in *Holt* ).

**24.** The Supreme Court also drew an analogy between the respective anti-alienation provisions of ERISA and the Social Security Act. *Guidry*, —— U.S. at ——, 110 S.Ct. at 685, 107 L.Ed.2d at 792.

We think that *Buren* is directly applicable here. This case, like *Buren*, presents no conflict between competing statutory schemes. Section 541(c)(2) of the Code defers to non-bankruptcy law, and ERISA is a species of non-bankruptcy law. No clearly stated policy of the Code is negated by interpreting § 541(c)(2) according to its plain terms. And the Sixth Circuit's conclusion that § 522's reference to social security benefits constituted insufficient evidence of an attempt by Congress to "repeal" the Social Security Act's anti-alienation provision lends particularly strong support for our determination that the anti-alienation provision in ERISA-qualified pension plans is enforceable in bankruptcy.

For the reasons stated above, we hold that Mrs. Idalski's interest in the retirement plan was excluded from property of the estate under § 541(c)(2). An order denying the trustee's request for turnover will enter.